06-1464-cv
Westchester Day School v. Vill. of Mamaroneck

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

_____

August Term, 2006

(Argued December 1, 2006        Decided October 17, 2007)

Docket No. 06-1464-cv

_____

Westchester Day School,

Plaintiff-Appellee,

v.

Village of Mamaroneck, The Board of Appeals of the Village of
Mamaroneck, Mauro Gabriele, In his official capacity as member of
the Board of Appeals of the Village of Mamaroneck, George
Mgrditchian, In his official capacity as member of the Board of
Appeals of the Village of Mamaroneck, Peter Jackson, In his
official capacity as member of the Board of Appeals of the
Village of Mamaroneck, Barry Weprin, In his official capacity as
member of the Board of Appeals of the Village of Mamaroneck,
Clark Neuringer, In his official capacity as member of the Board
of Appeals of the Village of Mamaroneck and Antonio Vozza, In his
official capacity as a former member of the Board of Appeals of
the Village of Mamaroneck,

Defendants-Appellants,

United States of America,

Intervenor-Defendant.

_____

Before:
           CARDAMONE, and RAGGI, Circuit Judges,
             and BERMAN, District Judge*.

_____

_____

*      Hon. Richard M. Berman, United States District Judge for the
       Southern District of New York, sitting by designation.

_____

Defendant Village of Mamaroneck appeals from a judgment of the United States District Court for the Southern District of New York (Conner, J.) entered March 3, 2006, ruling that the Village violated the Religious Land Use and Institutionalized Persons Act by denying Westchester Day School a special permit to expand its facilities.

Affirmed.

_____

JOEL C. HAIMS, Morrison & Foerster LLP, New York, New York (Jack C. Auspitz, Morrison & Foerster LLP, New York, New York; Stanley D. Bernstein, Berstein Liebhard & Lifshitz, LLP, New York, New York, of counsel), for Plaintiff-Appellee.

KEVIN J. PLUNKETT, White Plains, New York (Robert Hermann, Darius P. Chafizadeh, Thacher Proffitt & Wood LLP, White Plains, New York; Joseph C. Messina, Lisa M. Fantino, Law Office of Joseph C. Messina, Mamaroneck, New York, of counsel), for Defendants-Appellants.

SARAH E. LIGHT, Assistant United States Attorney, New York, New York (Michael J. Garcia, United States Attorney, Sara L. Shudofsky, Assistant United States Attorney, Southern District of New York, New York, New York; Wan J. Kim, Assistant Attorney General, David K. Flynn, Eric W. Treene, Sarah E. Harrington, U.S. Department of Justice, Civil Rights Division, Appellate Section, Washington, D.C., of counsel), for Intervenor-Defendant and Amicus Curiae the United States of America.

_____

Derek L. Gaubatz, Washington, D.C. (Anthony R. Picarello, Jr., Lori E. Halstead, The Becket Fund for Religious Liberty, Washington, D.C., of counsel), filed a brief on behalf of the Becket Fund for Religious Liberty, the Association of Christian Schools International, and the Council for Christian Colleges and Universities as Amici Curiae.

_____

CARDAMONE, Circuit Judge:

The appeal before us is from a judgment entered March 3, 2006 in the United States District Court for the Southern District of New York (Conner, J.) that ordered the defendant Village of Mamaroneck to issue a permit to plaintiff Westchester Day School to proceed with the expansion of its facilities. For nearly 60 years Westchester Day School (plaintiff, WDS, day school, or school) has been operating an Orthodox Jewish co-educational day school with classes from pre-school to eighth grade. Believing it needed to expand, the school submitted construction plans to the Village of Mamaroneck and an application for the required special permit. When the village zoning board turned the application down, the present litigation ensued.

In the district court the school argued that the zoning board in denying its application for a permit violated the Religious Land Use and Institutionalized Persons Act (RLUIPA or Act), 42 U.S.C. § 2000cc et seq., by substantially burdening its religious exercise without a compelling government interest to justify its action. Following a bench trial, the district court ordered the zoning board to approve the school's application, agreeing that RLUIPA had been violated.

BACKGROUND

A. Westchester Day School's Property

Westchester Day School is located in the Orienta Point neighborhood of the Village of Mamaroneck, Westchester County,

2

New York. Its facilities are situated on 25.75 acres of largely undeveloped land (property) owned by Westchester Religious Institute. Westchester Religious Institute allows the school and other entities to use the property.

The school's buildings are far from typical. The original structures were built in the late nineteenth century, one as a summer home and another as a stable. The day school, which opened in 1948, renovated the summer home and the stable to create classrooms. The school constructed Wolfson Hall in the 1960s and in 1979 Westchester Hebrew High School, a separate entity from WDS, built a two-story high school building on the property. Thus, currently there are four principal buildings on the property: the summer home (Estate House or Castle), the stable (Carriage House), Wolfson Hall, and the high school building.

The Mamaroneck Village Code permits private schools to operate in "R-20 Districts" if the Zoning Board of Appeals of the Village of Mamaroneck (ZBA or zoning board) grants them a special permit. The property is in an R-20 district and WDS operates subject to obtaining such a permit which must be renewed every three years. Most recently the day school's permit was unanimously renewed on November 2, 2000, before the dispute giving rise to this litigation began. Several other schools are located in the vicinity of Orienta Point, including the Liberty Montessori School and Mamaroneck High School. Numerous large properties border the school property, including the Orienta

Beach Club, the Beach Point Club, the Hampshire Country Club, and several boat yards.

## B. Westchester Day School's Aims

As a Jewish private school, Westchester Day School provides its students with a dual curriculum in Judaic and general studies. Even general studies classes are taught so that religious and Judaic concepts are reinforced. In the nursery and kindergarten classes no distinction exists between Judaic and general studies; the dual curriculum is wholly integrated. In grades first through eighth, students spend roughly half their day on general subjects such as mathematics and social studies and half on Judaic studies that include the Bible, the Talmud, and Jewish history.

In an effort to provide the kind of synthesis between the Judaic and general studies for which the school aims, the curriculum of virtually all secular studies classes is permeated with religious aspects, and the general studies faculty actively collaborates with the Judaic studies faculty in arranging such a Jewish-themed curriculum. For example, the General Studies Curriculum Guide describes how social studies is taught in grades 6, 7, and 8, explaining that WDS tries "to develop an understanding of humanistic, philosophical thought, the nature of cause and effect in history, and the application of ethical Judaic principles to history and daily life" (emphasis added). The Guide further notes that "[s]tudying the history of Eretz Yisrael [the land of Israel] has become an increasingly prominent

4

feature of assemblies and social studies lessons." And, the Guide's Science Curriculum Map notes that in science class first graders are taught about "the world around them [and] the seasonal changes and connections to the Jewish holidays" (emphasis added).

The school's physical education teachers confer daily with the administration to ensure that during physical education classes Jewish values are being inculcated in the students. This kind of integration of Jewish and general culture is made possible when a school actively and consciously designs integrated curricular and extracurricular activities on behalf of its student body. See Jack Bieler, Integration of Judaic and General Studies in the Modern Orthodox Day School, 54:4 Jewish Education 15 (1986), available at http://www.lookstein.org/integration/bieler.htm. Thus, the school strives to have every classroom used at times for religious purposes, whether or not the class is officially labeled Judaic. A Jewish day school like WDS exists, at least in part, because Orthodox Jews believe it is the parents' duty to teach the Torah to their children. Since most Orthodox parents lack the time to fulfill this obligation fully, they seek out a school like WDS.

C. The Expansion Project

By 1998 WDS believed its current facilities inadequate to satisfy the school's needs. The district court's extensive findings reveal the day school's existing facilities are deficient and that its effectiveness in providing the education

5

Orthodox Judaism mandates has been significantly hindered as a consequence. The school's enrollment has declined since 2001, a trend the district court attributed in part to the zoning board's actions. As a result of the deficiencies in its current facilities the school engaged professional architects, land planners, engineers, and an environmental consulting firm to determine what new facilities were required. Based on these professionals' recommendations, WDS decided to renovate Wolfson Hall and the Castle and to construct a new building, Gordon Hall, specifically designed to serve the existing student population. The renovations would add 12 new classrooms; a learning center; small-group instructional rooms; a multi-purpose room; therapy, counseling, art and music rooms; and computer and science labs. All of them were to be used from time to time for religious education and practice.

In October 2001 the day school submitted to the zoning board an application for modification of its special permit to enable it to proceed with this $12 million expansion project. On February 7, 2002 the ZBA voted unanimously to issue a "negative declaration," which constituted a finding that the project would have no significant adverse environmental impact and thus that consideration of the project could proceed. After the issuance of the negative declaration, a small but vocal group in the Mamaroneck community opposed the project. As a result of this public opposition, on August 1, 2002 the ZBA voted 3-2 to rescind the negative declaration. The effect of the rescission was to

6

require WDS to prepare and submit a full Environmental Impact Statement.

### D. Prior Legal Proceedings

Instead, the school commenced the instant litigation on August 7, 2002 contending the rescission of the negative declaration violated RLUIPA and was void under state law. The suit named as defendants the Village of Mamaroneck, its ZBA, and the members of the zoning board in their official capacities (collectively, the Village or defendant).

On December 4, 2002 the district court granted WDS's motion for partial summary judgment and held that the negative declaration had not been properly rescinded, and therefore remained in full force and effect. See Westchester Day Sch. v. Vill. of Mamaroneck, 236 F. Supp. 2d 349 (S.D.N.Y. 2002). The Village did not appeal this ruling. Instead, the ZBA proceeded to conduct additional public hearings to consider the merits of the application. The ZBA had the opportunity to approve the application subject to conditions intended to mitigate adverse effects on public health, safety, and welfare that might arise from the project. Rather, on May 13, 2003 the ZBA voted 3-2 to deny WDS's application in its entirety.

The stated reasons for the rejection included the effect the project would have on traffic and concerns with respect to parking and the intensity of use. Many of these grounds were conceived after the ZBA closed its hearing process, giving the school no opportunity to respond. The district court found the

7

stated reasons for denying the application were not supported by evidence in the public record before the ZBA, and were based on several factual errors. It surmised that the application was in fact denied because the ZBA gave undue deference to the public opposition of the small but influential group of neighbors who were against the school's expansion plans. It also noted that the denial of the application would result in long delay of WDS's efforts to remedy the gross inadequacies of its facilities, and substantially increase construction costs.

On May 29, 2003 the school filed an amended complaint challenging the denial of its application. It asserted claims under RLUIPA, 42 U.S.C. § 1983, and the All Writs Act. Neither party demanded a jury trial. WDS moved for partial summary judgment, and on September 5, 2003 the district court granted that motion, holding that the Village had violated RLUIPA. See Westchester Day Sch. v. Vill. of Mamaroneck, 280 F. Supp. 2d 230 (S.D.N.Y. 2003). When the Village appealed, we vacated the district court's order and remanded the case for further proceedings. See Westchester Day Sch. v. Vill. of Mamaroneck, 386 F.3d 183 (2d Cir. 2004). After remand, the Village, for the first time, demanded a jury trial, which the district court denied. See Westchester Day Sch. v. Vill. of Mamaroneck, 363 F. Supp. 2d 667 (S.D.N.Y. 2005). The Village moved for summary judgment, which the trial court denied as to WDS's RLUIPA and All Writs Act claims, but granted as to the school's claim under 42

8

U.S.C. § 1983. See Westchester Day Sch. v. Vill. of Mamaroneck, 379 F. Supp. 2d 550 (S.D.N.Y. 2005).

A seven-day bench trial began on November 14, 2005 and resulted in the March 2006 judgment. The district court ordered the Village to issue WDS's special permit immediately, but reserved decision on damages and attorneys' fees pending appellate review. See Westchester Day Sch. v. Vill. of Mamaroneck, 417 F. Supp. 2d 477 (S.D.N.Y. 2006). From this ruling the Village appeals.[1]

## DISCUSSION

### I   Standard of Review

We review the district court's findings of fact for clear error and its conclusions of law de novo. See Guiles ex rel. Guiles v. Marineau, 461 F.3d 320, 323-24 (2d Cir. 2006).

### II   Application of RLUIPA

RLUIPA prohibits the government from imposing or implementing a land use regulation in a manner that

> imposes a substantial burden on the religious exercise of a person, including a religious assembly or institution, unless the government demonstrates that imposition of the burden on that person, assembly, or institution (A) is in furtherance of a compelling governmental interest; and (B) is the least restrictive means of furthering that compelling governmental interest.

---

[1]   The United States, as intervenor and amicus curiae, and the Becket Fund for Religious Liberty, the Association of Christian Schools International, and the Council for Christian Colleges and Universities, as amici curiae, filed briefs in support of plaintiff.

9

42 U.S.C. § 2000cc(a)(1). This provision applies only when the substantial burden imposed (1) is in a program that receives Federal financial assistance; (2) affects commerce with foreign nations, among the several states, or with Indian tribes; or (3) "is imposed in the implementation of a land use regulation or system of land use regulations, under which a government makes, or has in place formal or informal procedures or practices that permit the government to make, individualized assessments of the proposed uses for the property involved." 42 U.S.C. § 2000cc(a)(2).

### A. Religious Exercise

Religious exercise under RLUIPA is defined as "any exercise of religion, whether or not compelled by, or central to, a system of religious belief." § 2000cc-5(7)(A). Further, using, building, or converting real property for religious exercise purposes is considered to be religious exercise under the statute. § 2000cc-5(7)(B). To remove any remaining doubt regarding how broadly Congress aimed to define religious exercise, RLUIPA goes on to state that the Act's aim of protecting religious exercise is to be construed broadly and "to the maximum extent permitted by the terms of this chapter and the Constitution." § 2000cc-3(g).

Commenting at an earlier stage in this litigation on how to apply this standard, we expressed doubt as to whether RLUIPA immunized all conceivable improvements proposed by religious schools. That is to say, to get immunity from land use

10

regulation, religious schools need to demonstrate more than that the proposed improvement would enhance the overall experience of its students. Westchester Day Sch., 386 F.3d at 189. For example, if a religious school wishes to build a gymnasium to be used exclusively for sporting activities, that kind of expansion would not constitute religious exercise. Or, had the ZBA denied the Westchester Religious Institute's 1986 request for a special permit to construct a headmaster's residence on a portion of the property, such a denial would not have implicated religious exercise. Nor would the school's religious exercise have been burdened by the denial of a permit to build more office space. Accordingly, we suggested the district court consider whether the proposed facilities were for a religious purpose rather than simply whether the school was religiously-affiliated. Id.

On remand, the district court conducted the proper inquiry. It made careful factual findings that each room the school planned to build would be used at least in part for religious education and practice, finding that Gordon Hall and the other facilities renovated as part of the project, in whole and in all of their constituent parts, would be used for "religious education and practice." In light of these findings, amply supported in the record, the expansion project is a "building [and] conversion of real property for the purpose of religious exercise" and thus is religious exercise under § 2000cc-5(7)(B).

Hence, we need not now demarcate the exact line at which a school expansion project comes to implicate RLUIPA. That line

11

exists somewhere between this case, where every classroom being constructed will be used at some time for religious education, and a case like the building of a headmaster's residence, where religious education will not occur in the proposed expansion.

## B. Substantial Burden

Since substantial burden is a term of art in the Supreme Court's free exercise jurisprudence, we assume that Congress, by using it, planned to incorporate the cluster of ideas associated with the Court's use of it. See, e.g., Midrash Sephardi, Inc. v. Town of Surfside, 366 F.3d 1214, 1226 (11th Cir. 2004), cert. denied, 543 U.S. 1146 (2005) ("The Supreme Court's definition of 'substantial burden' within its free exercise cases is instructive in determining what Congress understood 'substantial burden' to mean in RLUIPA."). But see San Jose Christian Coll. v. City of Morgan Hill, 360 F.3d 1024, 1034 (9th Cir. 2004) (applying dictionary meanings to define substantial burden as "something that is oppressive" and "considerable in quantity"). Further, RLUIPA's legislative history indicates that Congress intended the term substantial burden to be interpreted "by reference to Supreme Court jurisprudence." 146 Cong. Rec. S7774, S7776 (2000).

Supreme Court precedents teach that a substantial burden on religious exercise exists when an individual is required to "choose between following the precepts of her religion and forfeiting benefits, on the one hand, and abandoning one of the precepts of her religion . . . on the other hand." Sherbert v.

12

Verner, 374 U.S. 398, 404 (1963). A number of courts use this standard as the starting point for determining what is a substantial burden under RLUIPA. See, e.g., Lovelace v. Lee, 472 F.3d 174, 187 (4th Cir. 2006) (For RLUIPA purposes, a substantial burden is something that "puts substantial pressure on an adherent to modify his behavior."). In the context in which this standard is typically applied -- for example, a state's denial of unemployment compensation to a Jehovah's Witness who quit his job because his religious beliefs prevented him from participating in the production of war materials, see Thomas v. Review Bd. of Ind. Employment Sec. Div., 450 U.S. 707, 709 (1981) -- it is not a difficult standard to apply. By denying benefits to Jehovah's Witnesses who follow their beliefs, the state puts undue pressure on the adherents to alter their behavior and to violate their beliefs in order to obtain government benefits, thereby imposing a substantial burden on religious exercise.

But in the context of land use, a religious institution is not ordinarily faced with the same dilemma of choosing between religious precepts and government benefits. When a municipality denies a religious institution the right to expand its facilities, it is more difficult to speak of substantial pressure to change religious behavior, because in light of the denial the renovation simply cannot proceed. Accordingly, when there has been a denial of a religious institution's building application, courts appropriately speak of government action that directly coerces the religious institution to change its behavior, rather

13

than government action that forces the religious entity to choose between religious precepts and government benefits. See, e.g., Midrash Sephardi, 366 F.3d at 1227 ("[A] substantial burden is akin to significant pressure which directly coerces the religious adherent to conform his or her behavior accordingly."). Here, WDS contends that the denial of its application in effect coerced the day school to continue teaching in inadequate facilities, thereby impeding its religious exercise.

Yet, when the denial of a religious institution's application to build is not absolute, such would not necessarily place substantial pressure on the institution to alter its behavior, since it could just as easily file a second application that remedies the problems in the first. As a consequence, as we said when this case was earlier before us, "rejection of a submitted plan, while leaving open the possibility of approval of a resubmission with modifications designed to address the cited problems, is less likely to constitute a 'substantial burden' than definitive rejection of the same plan, ruling out the possibility of approval of a modified proposal." Westchester Day Sch., 386 F.3d at 188. Of course, a conditional denial may represent a substantial burden if the condition itself is a burden on free exercise, the required modifications are economically unfeasible, or where a zoning board's stated willingness to consider a modified plan is disingenuous. Id. at 188 n.3. However, in most cases, whether the denial of the application was absolute is important; if there is a reasonable

14

opportunity for the institution to submit a modified application, the denial does not place substantial pressure on it to change its behavior and thus does not constitute a substantial burden on the free exercise of religion.

We recognize further that where the denial of an institution's application to build will have minimal impact on the institution's religious exercise, it does not constitute a substantial burden, even when the denial is definitive. There must exist a close nexus between the coerced or impeded conduct and the institution's religious exercise for such conduct to be a substantial burden on that religious exercise. Imagine, for example, a situation where a school could easily rearrange existing classrooms to meet its religious needs in the face of a rejected application to renovate. In such case, the denial would not substantially threaten the institution's religious exercise, and there would be no substantial burden, even though the school was refused the opportunity to expand its facilities.

Note, however, that a burden need not be found insuperable to be held substantial. See Saints Constantine and Helen Greek Orthodox Church, Inc. v. City of New Berlin, 396 F.3d 895, 901 (7th Cir. 2005). When the school has no ready alternatives, or where the alternatives require substantial "delay, uncertainty, and expense," a complete denial of the school's application might be indicative of a substantial burden. See id.

We are, of course, mindful that the Supreme Court's free exercise jurisprudence signals caution in using effect alone to

15

determine substantial burden. See generally Lyng v. Nw. Indian Cemetery Protective Ass'n, 485 U.S. 439, 451 (1988) (observing that the "line between unconstitutional prohibitions on the free exercise of religion and the legitimate conduct by government of its own affairs . . . cannot depend on measuring the effects of a governmental action on a religious objector's spiritual development" (emphasis added)). This is because an effect focused analysis may run up against the reality that "[t]he freedom asserted by [some may] bring them into collision with [the] rights asserted by" others and that "[i]t is such conflicts which most frequently require intervention of the State to determine where the rights of one end and those of another begin." Braunfeld v. Brown, 366 U.S. 599, 604 (1961). Accordingly, the Supreme Court has held that generally applicable burdens, neutrally imposed, are not "substantial." See Jimmy Swaggart Ministries v. Bd. of Equalization, 493 U.S. 378, 389-91 (1990).

This reasoning helps to explain why courts confronting free exercise challenges to zoning restrictions rarely find the substantial burden test satisfied even when the resulting effect is to completely prohibit a religious congregation from building a church on its own land. See Christian Gospel Church, Inc. v. City and County of S.F., 896 F.2d 1221, 1224 (9th Cir. 1990); Messiah Baptist Church v. County of Jefferson, 859 F.2d 820, 824-25 (10th Cir. 1988); Grosz v. City of Miami Beach, 721 F.2d 729, 739-40 (11th Cir. 1983); Lakewood, Ohio Congregation of Jehovah's

16

Witnesses, Inc. v. City of Lakewood, 699 F.2d 303, 304 (6th Cir. 1983); cf. Islamic Ctr. of Miss., Inc. v. City of Starkville, 840 F.2d 293, 302-03 (5th Cir. 1988) (finding substantial burden where city intentionally discriminated against Muslims and ordinance "leaves no practical alternatives for establishing a mosque in the city limits").

A number of our sister circuits have applied this same reasoning in construing RLUIPA's substantial burden requirement. For example, the Seventh Circuit has held that land use conditions do not constitute a substantial burden under RLUIPA where they are "neutral and traceable to municipal land planning goals" and where there is no evidence that government actions were taken "because [plaintiff] is a religious institution." Vision Church v. Vill. of Long Grove, 468 F.3d 975, 998-99 (7th Cir. 2006). Similarly, the Ninth Circuit has held that no substantial burden was imposed, even where an ordinance "rendered [plaintiff] unable to provide education and/or worship" on its property, because the plaintiff was not "precluded from using other sites within the city" and because "there [is no] evidence that the City would not impose the same requirements on any other entity." San Jose Christian Coll., 360 F.3d at 1035. The Eleventh Circuit has also ruled that "reasonable 'run of the mill' zoning considerations do not constitute substantial burdens." Midrash Sephardi, 366 F.3d at 1227-28 & n.11.

The same reasoning that precludes a religious organization from demonstrating substantial burden in the neutral application

17

of legitimate land use restrictions may, in fact, support a substantial burden claim where land use restrictions are imposed on the religious institution arbitrarily, capriciously, or unlawfully. The arbitrary application of laws to religious organizations may reflect bias or discrimination against religion. Thus, in Saints Constantine and Helen, the Seventh Circuit concluded that a substantial burden was demonstrated in circumstances where the "decision maker cannot justify" the challenged ruling and where "repeated legal errors by the City's officials casts doubt on their good faith." 396 F.3d at 899-01. Similarly, in Guru Nanak Sikh Soc'y v. County of Sutter, 456 F.3d 978, 989-91 (9th Cir. 2006), the Ninth Circuit held that a substantial burden was shown where government officials "inconsistently applied" specific policies and disregarded relevant findings "without explanation." Where the arbitrary, capricious, or unlawful nature of a defendant's challenged action suggests that a religious institution received less than even-handed treatment, the application of RLUIPA's substantial burden provision usefully "backstops the explicit prohibition of religious discrimination in the later section of the Act." Saints Constantine and Helen, 396 F.3d at 900.

Accordingly, we deem it relevant to the evaluation of WDS's particular substantial burden claim that the district court expressly found that the zoning board's denial of the school's application was "arbitrary and capricious under New York law because the purported justifications set forth in the Resolution

18

do not bear the necessary substantial relation to public health, safety or welfare," and the zoning board's findings are not supported by substantial evidence. Westchester Day Sch., 417 F. Supp. 2d at 564. Although the Village disputes this finding, we conclude that it is amply supported by both the law and the record evidence.

As the New York Court of Appeals has made plain, a zoning board decision based on grounds "unrelated to the public's health, safety or welfare" is "beyond the scope of the municipality's police power, and, thus, impermissible." Cornell Univ. v. Bagnardi, 68 NY2d 583, 597 (1986). Even when a board considers permissible factors, the law demands that its analysis be supported by substantial evidence. Twin County Recycling Corp. v. Yevoli, 90 NY2d 1000, 1002 (1997) (mem.). Moreover, under New York law, a municipality may not demand that a religious institution show that "no ill effects will result from the proposed use in order to receive a special permit," because such a requirement "fails to recognize that educational and religious uses ordinarily have inherent beneficial effects that must be weighed against their potential for harming the community." Bagnardi, 68 NY2d at 597.

The district court reasonably concluded that the ZBA failed to comply with these legal mandates in several respects. For example, the zoning board denied WDS's application based, in part, on an accusation that the school made "a willful attempt" to mislead the zoning board. In fact, the accusation was

19

unsupported by the evidence and based on the zoning board's own error with respect to certain relevant facts. Westchester Day Sch., 417 F. Supp. 2d at 531, 571. The ZBA's allegations of deficiencies in the school's traffic study were also unsupported by the evidence before it. See id. at 564-66. The concern about lack of adequate parking was based on the zoning board's own miscalculation. See id. at 567. Indeed, the ZBA impermissibly based its decision on speculation about future expansion, without a basis in fact. See id. at 568. In each of these instances, the ZBA's assumptions were not only wrong; they were unsupported by its own experts. See id. at 532, 566, 567, 569. Indeed, the resolution drafted by the ZBA's consultants, which would have approved WDS's application subject to conditions addressing various ZBA concerns, was never circulated to the whole zoning board before it issued the challenged denial. See id. at 569. In sum, the record convincingly demonstrates that the zoning decision in this case was characterized not simply by the occasional errors that can attend the task of government but by an arbitrary blindness to the facts. As the district court correctly concluded, such a zoning ruling fails to comply with New York law.

While the arbitrary and unlawful nature of the ZBA denial of WDS's application supports WDS's claim that it has sustained a substantial burden, two other factors drawn from our earlier discussion must be considered in reaching such a burden determination: (1) whether there are quick, reliable, and

20

financially feasible alternatives WDS may utilize to meet its religious needs absent its obtaining the construction permit; and (2) whether the denial was conditional. These two considerations matter for the same reason: when an institution has a ready alternative -- be it an entirely different plan to meet the same needs or the opportunity to try again in line with a zoning board's recommendations -- its religious exercise has not been substantially burdened. The plaintiff has the burden of persuasion with respect to both factors. See § 2000cc-2 (putting burden on plaintiff to prove that government's action substantially burdened plaintiff's exercise of religion).

Here, the school could not have met its needs simply by reallocating space within its existing buildings. The architectural firm it hired determined that certain essential facilities would have to be incorporated into a new building, because not enough space remained in the existing buildings to accommodate the school's expanding needs. Further, experts hired by WDS determined that the planned location for Gordon Hall was the only site that would accommodate the new building. The answer to the first factor is there were not only no quick, reliable, or economically feasible alternatives, there were no alternatives at all.

In examining the second factor -- whether the Village's denial of the school's application was conditional or absolute -- we look at several matters: (a) whether the ZBA classified the denial as complete, (b) whether any required modification would

21

itself constitute a burden on religious exercise; (c) whether cure of the problems noted by the ZBA would impose so great an economic burden as to make amendment unworkable; and (d) whether the ZBA's stated willingness to consider a modified proposal was disingenuous. See Westchester Day Sch., 386 F.3d at 188 n.3.

For any of the following reasons, we believe the denial of WDS's application was absolute. First, we observe that the ZBA could have approved the application subject to conditions intended to mitigate adverse effects on public health, safety, and welfare. Yet the ZBA chose instead to deny the application in its entirety. It is evident that in the eyes of the ZBA's members, the denial was final since all of them discarded their notes after voting on the application. Second, were WDS to prepare a modified proposal, it would have to begin the application process anew. This would have imposed so great an economic burden as to make the option unworkable. Third, the district court determined that ZBA members were not credible when they testified they would give reasonable consideration to another application by WDS. When the board's expressed willingness to consider a modified proposal is insincere, we do not require an institution to file a modified proposal before determining that its religious exercise has been substantially burdened.

Consequently, we are persuaded that WDS has satisfied its burden in proving that there was no viable alternative to achieve its objectives, and we conclude that WDS's religious exercise was

22

substantially burdened by the ZBA's arbitrary and unlawful denial of its application.

## C. Least Restrictive Means to Further a Compelling State Interest

Under RLUIPA, once a religious institution has demonstrated that its religious exercise has been substantially burdened, the burden of proof shifts to the municipality to prove it acted in furtherance of a compelling governmental interest and that its action is the least restrictive means of furthering that interest. § 2000cc-2(b). Compelling state interests are "interests of the highest order." Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah, 508 U.S. 520, 546 (1993). The Village claims that it has a compelling interest in enforcing zoning regulations and ensuring residents' safety through traffic regulations. However, it must show a compelling interest in imposing the burden on religious exercise in the particular case at hand, not a compelling interest in general. See, e.g., Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal, 546 U.S. 418, 432 (2006) ("Under the more focused inquiry required by RFRA and the compelling interest test, the Government's mere invocation of the general characteristics of Schedule I substances . . . cannot carry the day. . . . [T]here is no indication that Congress . . . considered the harms posed by the particular use at issue here . . . ." (emphases added)).

The district court's findings reveal the ZBA's stated reasons for denying the application were not substantiated by

23

evidence in the record before it. The court stated the application was denied not because of a compelling governmental interest that would adversely impact public health, safety, or welfare, but was denied because of undue deference to the opposition of a small group of neighbors.

Further, even were we to determine that there was a compelling state interest involved, the Village did not use the least restrictive means available to achieve that interest. The ZBA had the opportunity to approve the application subject to conditions, but refused to consider doing so.

III  Constitutionality of RLUIPA

Given our conclusion that the ZBA violated RLUIPA by denying WDS's application, the question remains whether RLUIPA was constitutionally applied. The Village challenges RLUIPA on the grounds that it exceeds Congress' Fourteenth Amendment (§ 5) and Commerce Clause powers and that the Act is unconstitutional under the Tenth Amendment and the Establishment Clause.

RLUIPA states that it only applies when (1) "the substantial burden is imposed in a program or activity that receives Federal financial assistance . . . ," (2) "the substantial burden affects, or removal of that substantial burden would affect, commerce with foreign nations, among the several States, or with Indian tribes . . . ," or (3) "the substantial burden is imposed in the implementation of a land use regulation or system of land use regulations, under which a government makes, or has in place formal or informal procedures or practices that permit the

24

government to make, individualized assessments of the proposed uses for the property involved." § 2000cc(a)(2).

By limiting RLUIPA's scope to cases that present one of these jurisdictional nexuses, Congress alternatively grounded RLUIPA, depending on the facts of a particular case, in the Spending Clause, the Commerce Clause, and § 5 of the Fourteenth Amendment. There is no claim here that the ZBA receives federal financial assistance, but WDS does assert both that the substantial burden on its religious exercise affects interstate commerce and that it is imposed through formal procedures that permit the government to make individualized assessments of the proposed uses for the property involved. Thus, we must examine whether RLUIPA is constitutionally applied under Congress' Commerce Clause power or whether it is constitutionally applied under Congress' power to create causes of action vindicating Fourteenth Amendment rights.

A.  Congress' Power Under the Commerce Clause

The Constitution grants Congress the power "[t]o regulate Commerce . . . among the several States." U.S. Const. art. I, § 8, cl. 3. As noted above, Congress made explicit reference to this grant by limiting the application of RLUIPA to cases in which, inter alia, "the substantial burden affects, or removal of that substantial burden would affect, commerce . . . among the several States." § 2000cc(a)(2)(B).

As the Supreme Court has made plain, the satisfaction of such a jurisdictional element -- common in both civil and

25

criminal cases -- is sufficient to validate the exercise of congressional power because an interstate commerce nexus must be demonstrated in each case for the statute in question to operate. See United States v. Morrison, 529 U.S. 598, 611-12 (2000) ("Such a jurisdictional element may establish that the enactment is in pursuance of Congress' regulation of interstate commerce."); United States v. Lopez, 514 U.S. 549, 561 (1995) (noting that statute in question "contains no jurisdictional element which would ensure, through case-by-case inquiry, that the [activity] in question affects interstate commerce"). Following suit, this Court has consistently upheld statutes under the Commerce Clause on the basis of jurisdictional elements. See, e.g., United States v. Griffith, 284 F.3d 338, 346-48 (2d Cir. 2002); United States v. Santiago, 238 F.3d 213, 216 (2d Cir. 2001) (per curiam). Consistent with this precedent, we now hold that, where the relevant jurisdictional element is satisfied, RLUIPA constitutes a valid exercise of congressional power under the Commerce Clause. See, e.g., United States v. Maui County, 298 F. Supp. 2d 1010, 1015 (D. Haw. 2003) (reaching same conclusion); Freedom Baptist Church v. Twp. of Middletown, 204 F. Supp. 2d 857, 866-68 (E.D. Pa. 2002) (same).

In this case, the district court found the jurisdictional element satisfied by evidence that the construction of Gordon Hall, a 44,000 square-foot building with an estimated cost of $9 million, will affect interstate commerce. We identify no error in this conclusion. As we have recognized, the evidence

26

need only demonstrate a minimal effect on commerce to satisfy the jurisdictional element. See Griffith, 284 F.3d at 347. Further, we have expressly noted that commercial building construction is activity affecting interstate commerce. See Reich v. Mashantucket Sand & Gravel, 95 F.3d 174, 181 (2d Cir. 1996) ("[C]onstruction efforts . . . have a direct effect on interstate commerce.").

In light of our determination that RLUIPA's application in the present case is constitutional under the Commerce Clause, there is no need to consider or decide whether its application could be grounded alternatively in § 5 of the Fourteenth Amendment.

B.   Tenth Amendment

The Tenth Amendment provides that "the powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or the people." As the Supreme Court has explained, "[i]f a power is delegated to Congress in the Constitution, the Tenth Amendment expressly disclaims any reservation of that power to the States." New York v. United States, 505 U.S. 144, 156 (1992). The power to regulate interstate commerce was delegated to Congress in the Constitution. Nonetheless, in New York, the Court said that even in situations where Congress has the power to pass laws requiring or prohibiting certain acts, it has no power "directly to compel the States to require or prohibit those acts." Id. at 166. We do not believe RLUIPA directly compels states to require or

27

prohibit any particular acts. Instead, RLUIPA leaves it to each state to enact and enforce land use regulations as it deems appropriate so long as the state does not substantially burden religious exercise in the absence of a compelling interest achieved by the least restrictive means.

## C. Establishment Clause

In determining whether a particular law violates the Establishment Clause, which provides in the First Amendment that "Congress shall make no law respecting an establishment of religion," U.S. Const. amend. I, we examine the government conduct at issue under the three-prong analysis articulated by the Supreme Court in Lemon v. Kurtzman, 403 U.S. 602 (1971). Under Lemon, government action that interacts with religion must: (1) have a secular purpose, (2) have a principal effect that neither advances nor inhibits religion, and (3) not bring about an excessive government entanglement with religion. Id. at 612-13. RLUIPA's land use provisions plainly have a secular purpose, that is, the same secular purpose that RLUIPA's institutionalized persons provisions have: to lift government-created burdens on private religious exercise. See Cutter v. Wilkinson, 544 U.S. 709, 720 (2005). As the Supreme Court explained in Cutter, such purpose is "compatible with the Establishment Clause." Id.

Similarly, the principal or primary effect of RLUIPA's land use provisions neither advances nor inhibits religion. As the Supreme Court has explained, a law produces forbidden effects under Lemon if "the government itself has advanced religion

28

through its own activities and influence." <u>Corp. of Presiding Bishop of Church of Jesus Christ of Latter-day Saints v. Amos</u>, 483 U.S. 327, 337 (1987). Under RLUIPA, the government itself does not advance religion; all RLUIPA does is permit religious practitioners the free exercise of their religious beliefs without being burdened unnecessarily by the government.

Finally, RLUIPA's land use provisions do not foster an excessive government entanglement with religion. Although the Village contends that RLUIPA fails every part of the <u>Lemon</u> test, it makes no argument that the land use provisions foster intolerable levels of interaction between church and state or the continuing involvement of one in the affairs of the other. <u>Agostini v. Felton</u>, 521 U.S. 203, 232-33 (1997); <u>Walz v. Tax Comm'n of N.Y.</u>, 397 U.S. 664, 674-75 (1970). Further, entanglement becomes excessive only when it advances or inhibits religion. <u>Agostini</u>, 521 U.S. at 233 (treating entanglement prong as aspect of effects prong under <u>Lemon</u> test); <u>Skoros v. City of N.Y.</u>, 437 F.3d 1, 36 (2d Cir. 2006). RLUIPA cannot be said to advance religion simply by requiring that states not discriminate against or among religious institutions. <u>See</u> <u>Midrash Sephardi</u>, 366 F.3d at 1241.

Accordingly, we find that RLUIPA's land use provisions do not violate the Establishment Clause.

## IV  Jury Waiver

We turn finally to the question of whether defendant waived its right to trial by jury. Under Federal Rule of Civil

29

Procedure 38(b), "[a]ny party may demand a trial by jury of any issue triable of right by a jury." Failure to serve a demand constitutes a waiver of that right. Fed. R. Civ. P. 38(d). Here, the Village initially failed to demand a jury trial. A litigant who has waived a jury may nonetheless demand one with respect to new issues raised by later pleadings, unless the new issues are simply "artful rephrasings" of existing issues. See Rosen v. Dick, 639 F.2d 82, 94 (2d Cir. 1980). When the same parties are the litigants before and after an amended pleading, we are unlikely to find a new issue has been raised. Id. at 96. An amended complaint asserting new theories of recovery, based on the same facts as the original complaint, will not renew a defendant's right to a jury trial when that right was waived with respect to the original complaint. 8 James Wm. Moore, Moore's Federal Practice § 38.50[8][d] (3d ed. 2006).

The Village declares its amended answer -- filed a year and a half after commencement of the suit -- raised new issues, and that it therefore had a right to demand a new trial on those issues. But its amended answer was identical to its initial answer except that it added a number of affirmative defenses not asserted earlier. The new affirmative defenses alleged that defendant's denial of WDS's application was not a complete denial, that it did not substantially burden WDS's free exercise of religion, that the denial was based on compelling state interests, and that RLUIPA if applied to WDS's activities is unconstitutional. By denying plaintiff's contrary allegations,

30

the defendant had already raised the first three issues in its initial answer.

We are left with the Village's affirmative defense that RLUIPA if applied to WDS's activities would be unconstitutional. But the defendant was on notice that the court would be deciding all issues relating to the general dispute. The Village should reasonably have known at the time it initially waived its jury trial right that the constitutionality of RLUIPA could constitute a part of the dispute. Like an amended complaint that simply asserts new theories of recovery, an amended answer that asserts new defense theories based on the same facts does not reestablish the defendant's right to demand a jury trial. Hence, the district court correctly ruled the Village had not revived its right to such under Rule 38(b).

The Village also insists that the district court abused its discretion by not ordering a jury trial under Rule 39(b). Rule 39(b) provides that "notwithstanding the failure of a party to demand a jury . . . , the court in its discretion upon motion may order a trial by a jury of any or all issues." We have ruled that "inadvertence in failing to make a timely jury demand does not warrant a favorable exercise of discretion under Rule 39(b)." Noonan v. Cunard S.S. Co., 375 F.2d 69, 70 (2d Cir. 1967) (Friendly, J.); see also Higgins v. Boeing Co., 526 F.2d 1004, 1006 n.2 (2d Cir. 1975) (per curiam) ("[D]espite the discretionary language of Rule 39(b) some cause beyond mere inadvertence must be shown to permit granting an untimely

31

demand."). Here, the Village admits that it neglected to demand a jury in June 2003. Accordingly, it was not an abuse of discretion for the district court to deny the Village's 2004 request for a favorable exercise of its discretion under Rule 39(b).

V  All Writs Act and Supplemental State Law Claims

After determining the Village violated RLUIPA, the district court ordered the ZBA immediately and unconditionally to issue WDS's special permit modification. Such relief is proper under RLUIPA. See § 2000cc-2(a) (parties asserting RLUIPA claims may obtain "appropriate relief" against a government). As a consequence, there is no need for us to examine the alternative bases the district court provided to justify this relief.

CONCLUSION

Accordingly, for the foregoing reasons, the judgment of the district court is affirmed.