**THIRD CHURCH OF CHRIST, SCIENTIST, OF NEW YORK CITY, Plaintiff,**

v.

**CITY OF NEW YORK, and Patricia J. Lancaster, in her official capacity as Commissioner of the New York City Department of Buildings, Defendants.**

No. 07 Civ. 10962 (DAB).

United States District Court, S.D. New York.

Dec. 2, 2008.

John R. Cuti, Monica Pa, Victor A. Kovner, Davis Wright Tremaine LLP, New York, NY, for Plaintiff.

Ave Maria Brennan, Corporation Counsel Office City of New York, New York, NY, for Defendants.

Neil G. Sparber, Brian Wayne Tilker, Fulbright & Jaworski L.L.P., New York, NY, for Movant.

Charles Palella, Kurzman, Karelsen & Frank, LLP, Alexander Fausto Ferrini, Barry B. Lepatner & Associates LLP, New York, NY, for Interested Parties.

### MEMORANDUM & ORDER

DEBORAH A. BATTS, District Judge.

This case arose as a Motion for a Temporary Restraining Order (TRO) and Preliminary Injunction filed on December 3, 2007. The Court held a hearing on the same day and granted a TRO to Plaintiff, the Third Church of Christ, Scientist ("the Church"), preventing the City of New York from enforcing the Department of Buildings' ("DOB") decision to revoke pre-consideration for the Rose Group to hold catered social events in the Church building pursuant to a lease with the Church. The Court signed a more detailed TRO on December 7, 2007.

On March 3, 2008, the Court permitted the Plaintiff to conduct discovery of non-parties similar to Plaintiff that conduct catered social events. A hearing was held on July 10, 2008 to attempt to resolve discovery issues arising from the subpoena of documents from non-parties. Finally, the Court held a Preliminary Injunction hearing on November 6, 2008. Prior to the hearing, the Court gave notice that, pursuant to Federal Rule of Civil Procedure Rule 65, the hearing would be a consolidated hearing on Plaintiff's Motion for a Preliminary Injunction and a trial on the merits.

For the reasons stated herein. Plaintiff's Motion for a Preliminary Injunction, deemed to be a Motion for a Permanent Injunction, is GRANTED, enjoining the City from enforcing its revocation of pre-consideration that catered social events at 583 Park Avenue are an accessory use to the community facility, the Third Church of Christ, Scientist.

## I. FACTUAL BACKGROUND

The Church purchased property at 583 Park Avenue in 1920, and completed construction of the church building at issue in this litigation ("the Building") in or around 1924. (Draper Supp. Decl. at ¶¶ 2,3.) The Church has used the Building as its primary place of worship since then, with membership peaking at around one thou-

sand people in or about the 1940s and 1950s. (*Id.* at ¶ 5.) Over the years, the Church's membership has declined and it currently has fewer than one hundred members. (*Id.* at ¶ 6.) According to Thomas Draper, the Vice Chairman of the Board of Trustees for the Church, "[a] contributing factor to the decline in membership was the growing state of disrepair of the Building and the prohibitive costs of the necessary major capital repairs and renovations to the Building's aging infrastructure, many of which were necessary to bring the Building into compliance with the New York City Building Code." (Draper Decl. at ¶ 1; Draper Supp. Decl. at ¶ 7.) According to Draper, the costs of maintaining the building were significant and starting in at least the late 1990's the Church considered many different options to raise capital. (*See* Draper Supp. Decl. at ¶¶ 10–24.) Faced with having to sell the Building, the Church "resolved instead to find a long-term lease arrangement with a third party." (*Id.* at ¶ 29.)

In January 2006, the Church entered into a Lease Agreement ("the Lease") with the Rose Group Park Avenue LLC (the "Rose Group"). (Draper Decl. at ¶ 16, Ex. B.) The Lease permits the Rose Group to hold catered events at the Church for the next twenty years (with two five-year renewal options) in exchange for the Rose Group investing millions of dollars in capital repairs to the Church building and paying rent and ongoing maintenance costs. (*Id.*) The Lease prohibits the Rose Group from hosting events at any time that conflicts with the Church's religious services or activities. (*Id.*) According to the Church, it "permits us to continue owning the Building and using it at least

the same extent we did in the past, while accomplishing much needed building repairs and ongoing relief from many operating expenses." (Draper Supp. Decl. at ¶ 37.) Indeed, the Church engaged a third-party appraiser, The Staubach Company, to evaluate the Lease; Staubach found that the lease was fair, and noted that a Lease providing for use of the premises for all of the Church's current needs "is atypical in the market and is viewed as extremely favorable for the Church." (*Id.* at ¶ 41.)

However, the City points out, the Lease permits the Rose Group to exercise a high degree of control over the premises. (Brennan Decl. at ¶¶ 13–31.) For example, the Rose Group may cover the existing signs on the building facade indicating that the building is a Church [1] and give and withhold approval to the Church's hiring of custodial and maintenance employees. (Brennan Decl. at ¶ 23.) The Lease covers the entire "land and building known as 583 Park Avenue" rather than any portion or time period specific to the catered events. (*Id.* at ¶ 13.) In addition, the Lease requires the Rose Group to pay real estate taxes that become due if the current religious exemption is lost because of the catering business. (*Id.* at ¶ 14) The Lease permits the Rose Group to "contract directly with the local utility companies for all electric, gas, and water". (*Id.* at ¶ 15.) The Lease also provides for the "removal and storage off site of the pews from the main floor of the auditorium and the first (lowest) row of the balconies". (*Id.* at ¶ 16.) The Lease even restricts Plaintiff's use of the front door to "Sunday services, Wednesday evening services, Christmas Eve and Thanksgiving services, and

---

1. At the hearing held on November 6, 2008, Plaintiff's Attorney noted that the facade pediment is covered "at the insistence of the church, they didn't want any confusion when the Rose Group event was taking place that it was sponsoring it". (Nov. 6, 2008, Hearing Tr. 13:4–10.)

church corporate and organizational meetings." (*Id.* at ¶ 26.)

After the Lease was initially entered into, prior to commencing any of the agreed-upon activities, the Church and the Rose Group sought permission from the City. According to Draper, "[f]rom the inception of this project in 2005, we made clear that a precondition of the Lease was obtaining the necessary municipal permission for this tremendous undertaking." (Draper Supp. Decl. at ¶ 105.) On April 19, 2006, the City issued a pre-consideration determination, permitting catered events with certain restrictions, including "that the Accessory Social Hall is to be use and operated exclusively and only by the Church and for its members." (Brennan Decl. Ex. F.) The Church then wrote a letter, requesting modifications and stating that:

> For limited periods when the church is not being utilized for our congregation, we have provided for various catered events which will also contribute to the church's ability to sustain itself. These functions will be operated by a highly qualified, fully insured professional caterer who will be under contract with the Church ... The functions will be restricted by the contract with the Church ...

(Brennan Decl. Ex. G; Draper Supp. Decl. Ex FFF.) The letter was endorsed by Christopher Santulli, the Manhattan Borough Commissioner of the DOB, with a notation reading "OK to accept catered events under contract with the Church as complying with 'Accessory Social Hall' requirement of April 10, 2006 determination by L. Osorio." (*Id.*)

The Church sought this permission because, under the City's zoning rules for R–10 zoned districts (where the Church is located), only residences, community facilities (such as the Church), and uses that are "accessory" to residences and community facilities are permitted. (Zoning Resolution ("ZR") 12:10; ZR 22:00–14.) By the notation quoted above. Borough Commissioner Santulli found that catering at the Church was a permissible accessory use. As far as the Church was aware, this was the final determination. The attorney for the Defendant City of New York at this Court's hearing on November 6, 2008, noted that,

> When also [sic] Manhattan Borough Commissioner issues any determination, that is the determination. You don't then have to appeal it or get a second approval. It is only when a determination is challenged and the deputy commissioner would look at the determination and make another determination. But, no, I didn't mean to imply that the determination by the Manhattan Borough Commission [sic] was not final in this case.

(Nov. 6, 2008, Hearing Tr. 47:17–23.)

Therefore, on July 3, 2006, in reliance on Borough Commissioner Santulli's pre-consideration, the Rose Group and the Church executed the Lease Commencement Date Agreement expressly stating that the Lease was effective, commencing that day, because the necessary "Approval" had been obtained. (Draper Supp. Decl. at ¶ 107; Ex. GGG.)

According to Plaintiff, work was "well underway" in early 2007, with several million dollars having been spent to begin making the required capital repairs. (Kovner. Supp. Decl. at ¶¶ 3, 4.) At that point, Plaintiff submits, complaints began about the arrangements between the Church and the Rose Group. (*Id.*) The Plaintiff has submitted extensive paperwork and multiple declarations outlining a "campaign" by the Church's neighbors that Plaintiff alleges eventually caused the City to withdraw Commissioner Santulli's

pre-consideration. (*Id.* at ¶ 14) Plaintiff alleges that, "[u]nlike most NIMBY crusades, this one had political clout." (*Id.* at ¶ 14.) Indeed, Plaintiff catalogs the influential people involved in opposing the Church's plan.[2]

Whatever the reasons for revoking the pre-consideration, it is uncontroverted that the only reason this particular issue was raised beyond the level of the Manhattan Borough Commissioner, was that neighbors made complaints. (Nov. 6, 2008, Hearing Tr. 47:17–23 noting that "[i]t's only when a determination is challenged and the deputy commissioner would look at the determination and make another determination"; *id.* at 52:1–9 noting *inter alia* that "[w] e don't conduct sweeps of the city to look for this activity. If we get a complaint, we look into it just as we did here"; Tr. Arnold Dep. at 16:5–7 noting "in the absence of a complaint my guess is I would not have seen it.")

However, the City and the Church dispute whether political considerations came to bear on the City's decision-making. (*Compare* Brennan Supp. Decl. at ¶ 4 *with* Kovner Supp. Decl. at ¶¶ 14–18.)[3]

The City argues that, "[a]fter learning of the extent and frequency of the catering activity at the plaintiff's building in comparison to the use of the building by plaintiff, DOB determined that the prior approval of the Manhattan Borough Commissioner to allow catering at the building should not have been issued." (Brennan Supp. Decl. at ¶ 4.) During her deposition, the Department of Buildings Deputy Commissioner for Legal Affairs, Phyllis Arnold, described the process as follows:

As with most difficult decisions in the department, we, meaning me, the deputy commissioner for technical affairs, often City planning, members of the counsel's office, we, for the most part will discuss

2. Some of the "prominent, influential people" cited by the Plaintiff include: William J. Williams, partner at Sullivan and Cromwell; Peter Price, former-publisher of the *NT Post*; John A. Zaccaro and Geraldine Ferraro, former vice presidential candidate; George T. Lowy, a senior partner at Cravath, Swain & Moore, in addition to other co-op boards. (Kovner Supp. Decl. at ¶ 15.) Further, Plaintiff points to the fact that neighbors hired a law firm, and the City's "most influential public relations consultant, Howard Rubenstein." (*Id.* at ¶¶ 16, 17.)

3. However, Deputy Commissioner Arnold testified that "it was not unusual for a councilmember to call a DOB Borough Commissioner and request that the Borough Commissioner meet with private lawyers for the councilmember's constituents." (Brennan Supp. Decl. at ¶ 50.) She further stated that she didn't think Borough Commissioner Santulli "characterized it as pressure." (*Id.*) (*Cf.* Pl. Ex. 4 contained in Arnold Dep. at 67:10–68:5 and 68:13–69:3 summarizing Sarra Hale–Stern's account of a conversation with Borough Commissioner Santulli in which he is alleged to have said:

Nothing the church is doing is dangerous or illegal, the church has permits for all of the construction projects it is undertaking. The DOB has already given the church permission to hold events as an accessory use. A complaint has been made regarding accessory use and they are in the final stages of investigating the complaint.

The church, if it chose to, could withdraw its C of O, withdraw it's application to the AG's office and apply for temporary place of assembly permits indefinitely. He claimed there are event spaces all across the City that operate in this manner on a long-term basis.

. . . Santulli said that a permanent contract with the caterer could be a good thing because it can bring stability and consistency to an institutions relations with the surrounding community.

Liz mentioned that the electeds have already received complaints from residents about receive [sic] events held at the church.

Santulli said he was not aware of any problems. Santulli claims he never received a copy of the letter the electeds sent to the Rose Group recently.)

an issue among ourselves with the borough, technically that is, and ultimately advise the commissioner, then Commissioner Lancaster and First Deputy Limandri.

(Tr. Arnold Dep. 21:22–22:6.) According to Arnold:

The department has no authority to vary the zoning resolution. It is under the charter, the department enforces the zoning resolution. The legal question is, what does one do when there has been an error made. Case law is pretty clear that we are obliged to correct the error, notwithstanding the reliance by private party on the erroneous determination.

(*Id.* at 19:3–11.)

However, when repeatedly pressed, throughout the deposition, for a clear articulation of the standards used to determine whether a particular use is an "accessory use," Deputy Commissioner Arnold offered the following representations:

"A. A church conducting or a house of worship of any sort conducting catering—catered events is not, per se, a violation of zoning. The problem in this case was the relative use of the premises for the catering—the purported accessory use compared to the primary use." (Tr. Arnold Dep. at 109:17–23).

"Q. How did you know where to draw the line?

A. I knew that this was clearly on the other side of the line." (*Id.* at 110:5–10.)

"Q. Is this just know it when you see it?

A. No. This is an assessment of relative intensity and frequency." (*Id.* at 110:13–16.)

"A. I don't think it's a matter of numbers ... What was so problematic at this location wasn't necessarily the num-

bers of events. It was the relationship to a virtually non-existent primary use." (*Id.* at 113:2–21.)

"A. To the extent an accessory use determination is a fact-driven determination, any change in the facts would contribute, could contribute to a different result." (*Id.* at 115:10–13.)

"A. The factors for an accessory use determination under the law are not just the frequency but the intensity. It can be influenced by the layout, by the way egress goes, is laid out, but the terms of the commercial relationships. It's, as I said, a very fact-driven decision and I would say no one fact is dispositive." (*Id.* 119:23–120:6.)

"Q. And so you looked at [the evidence] and you formed the conclusion that that wasn't enough to be a vibrant primary religious use compared to the catering?

A. Compared to the catering.

Q. Even though there were only 47 catered events in 2007 and 104 sermons?

A. It's not just a matter of numbers.

Q. But in part, yes?

A. Including everything, frequency, sure." (*Id.* 126:12–22.)

"A. To the extent the lease was long-term and for what I would call was most if not the entire premises, it was certainly a factor." (*Id.* at 146:7–10.)

"A. I don't know that the contract by itself is suggestive. The fact that virtually the entire premises was the subject of the lease was a more significant factor." (*Id.* 146:25–147:4.)

"A. To the extent the signage masses [sic] [4] the name or identification of the reported primary use, it's suggestive that it's not, indeed, the primary use ... Everything is a factor." (*Id.* 185:2–13.)

4. The Court reads "masses" as "masks".

(*See also id.* at 105:16–19; 117:23–118:6; 136:11–17; 145:18–21; 152:11–17; 158:7–12.)

At the November 6, 2008 Hearing, the Court sought further clarification:

"Court: Ms. Brennan, in terms of the determination that there was an imbalance between accessory use and primary use, how was that determination made when the permit was revoked?

A. Your Honor, the Department of Buildings and the deputy commissioner, Phyllis Arnold, reviewed the material that was submitted by both the plaintiff and the neighbors, those in opposition to the catering facility, and based their determination on a review of that material.

Court: Was there some sort of analysis done of specific factors or was there just a review of all the facts and a conclusion was drawn?

A: Your Honor, there was a review of all the facts and a conclusion was drawn. There is no written analysis of the factors that were considered and weighed by the deputy commissioner in reaching her determination."

(Nov. 6, 2008 Hearing Tr. 2:25–3:7.)

On October 29, 2007, Deputy Commissioner Arnold sent a letter of "Intent to Revoke Approval and Permit" to the Church and the Rose Group stating, *inter alia*, "[b]ased on the information presented to us thus far, the catering establishment is not an accessory use because it does not comport with the Zoning Resolution's requirement that it be 'clearly incidental to, and customarily found' in connection with the Church." (Kovner Decl. at GG.) On November 30, 2007, the Department of Buildings sent a final determination revoking the approval. (*Id.*)

However, it appears that other neighbors of the Church have been conducting food service and catering businesses in violation of the Zoning Resolution, without censure from the City. For example, the Beekman is a former Class A Hotel which is now a cooperative apartment house, across the street, sixty feet away, from the Church. (Brennan Supp. Decl. at ¶¶ 91–100; Nov. 6, 2008 Hearing Tr. 7:7–9.) An entity known as "Fourth Wall" operates a restaurant at the Beekman which contains a private dining space for private parties, as well as a separate private dining facility known as "The Townhouse." (Brennan Supp. Decl. at ¶¶ 91–100.) In 2006, 307 private catered events were held at the Townhouse, and in 2007, 234 events. (*Id.*)

The current Certificate of Occupancy for the Beekman classifies it as an "apartment hotel" in which eating and drinking establishments are permitted "accessory use," "provided they are accessible only through the lobby of the building" and are limited to use by residents of the building. (*Id.*) But, it is uncontroverted that access to the restaurant here is not merely through the lobby of the building and that the restaurant is open to the general public. (Tr. Hearing Nov. 6, 2008 19:13–20.) The City, now aware of this violation as a result of the instant case, has issued a "Notice of Violation". (*Id.* 54:6–15.) However, the City concedes that a "Notice of Violation" is "very much" "removed" from a total revocation of permission. (*Id.*)

The other neighboring business in violation of the City's Zoning Resolution is the Regency Hotel. Unlike the Beekman and the Church, the Regency Hotel is located in a district zoned for both commercial and residential use. However, like the Beekman, the Certificate of Occupancy provides for an apartment hotel, in which, again, eating and drinking establishments are permitted accessory uses. However, the City concedes that "[t]o the extent that the eating and drinking establishments in the Regency Hotel are open to the public,

there is a violation of the Certificate of Occupancy restriction ... [and] a potential zoning violation." (Brennan Supp. Decl. at ¶¶ 101–104.) Like the Beekman, the Regency was issued only a "Notice of Violation." (Tr. Hearing Nov. 6, 2008 19:13–20.)

On December 3, 2007, the Church moved this Court for injunctive relief and a finalized Temporary Restraining Order was entered on December 7, 2007. After resolving several discovery disputes, the Court scheduled a Preliminary Injunction hearing for November 6, 2008. Prior to the hearing, the Court consolidated the hearing on the motion for a preliminary injunction with a trial on the merits. Fed. R.Civ.P. 65. At the hearing, the Plaintiff stated that "we have no objection to proceeding under 65(a)(2) for a permanent injunction". (Nov. 6, 2008 Hearing Tr. 3:14–15.) Consequently, this Memorandum and Order addresses Plaintiff's Motion for a Permanent Injunction.

## II. DISCUSSION

The Religious Land Use and Institutionalized Persons Act of 2000 ("RLUIPA" or "the Act"), "is the latest of long-running congressional efforts to accord religious exercise heightened protection from government-imposed burdens" consistent with the Supreme Court's precedents. *Cutter v. Wilkinson,* 544 U.S. 709, 714, 125 S.Ct. 2113, 161 L.Ed.2d 1020 (2005) (describing the evolution of law from RFRA to RLUIPA). Plaintiff has asserted claims under two of the Act's provisions. Section (a), the "Substantial Burden" provision, and Section (b)(1), the "Equal Terms" provision. (Compl. at ¶¶ 64–79); 42 U.S.C.A. § 2000cc. Those provisions read as follows:

Substantial Burden:
No government shall impose or implement a land use regulation in a manner that imposes a substantial burden on the religious exercise of a person, including a religious assembly or institution, unless the government demonstrates that imposition of the burden on that person, assembly, or institution—

(A) is in furtherance of a compelling governmental interest; and

(B) is the least restrictive means of furthering that compelling governmental interest.

42 U.S.C. § 2000cc(a).

Equal Terms:
No government shall impose or implement a land use regulation in a manner that treats a religious assembly or institution on less than equal terms with a nonreligious assembly or institution.

42 U.S.C. § 2000cc(b). In addition. Plaintiff has asserted an Equal Protection Claim and a First Amendment, Free Exercise Claim. (Compl. at ¶¶ 80–98.)

### A. The Substantial Burden Provision

■ The Second Circuit looked at the Substantial Burden provision in a series of cases entitled *Westchester Day School v. Village of Mamaroneck.* 504 F.3d 338 (2d Cir.2007). In those cases, the Court began the inquiry by questioning whether the substantial burden was on a "religious exercise" as contemplated by the statute. *Id.* at 348. The Circuit "suggested the district court consider whether the proposed facilities were for a religious purpose rather than simply whether the school was religiously-affiliated." *Id.* For example, they stated, "if a religious school wishes to build a gymnasium to be used exclusively for sporting activities, that kind of expansion would not constitute religious exercise." *Id.* at 347.

There is no question that land use regulation at issue here, the City's Zoning Resolution, is being imposed on a religious

assembly or institution, the Church. However, the "burden" in this case is revocation of permission to hold catered social events. Under the law of the Circuit, a burden on a Church's ability to hold catered social events is not a burden on "religious exercise" as contemplated by RLUIPA. Consequently, Plaintiff's Substantial Burden claim must fail.

## B. The Equal Terms Provision

Plaintiff has acknowledged that, although it has alleged multiple causes of action, their claim strongest is under the Equal Terms provision of RLUIPA.[5] The Church argues that "the City knowingly permits non-religious institutions in the very same residential neighborhood as the Church to conduct revenue-generating catered social events, but prohibits the Church from doing the same thing." (Pl. Supp. Mem. of Law at 15.) This, the Church argues, "is a textbook violation of the equal terms provision." (*Id.*)

As far as this Court is aware, this application of the Equal Terms provision presents an issue of first impression and has not yet been addressed by the Second Circuit. However, several other Courts of Appeal have been asked to apply the Equal Terms provision and each have developed unique analytical frameworks for giving content to the broad language of the statute. The key point of diversion among the Courts is the metric of comparison they employ to determine whether particular religious and non-religious institutions or assemblies are properly measured against one another under the statute. This is the threshold area of inquiry because, "while § (b)(1) has the 'feel' of an equal protection law, it lacks the 'similarly situated' requirement usually found in equal protection analysis." *Midrash Sephardi, Inc. v. Town of Surfside,* 366 F.3d 1214, 1229 (11th Cir.2004). Therefore, Courts cannot fall back on the familiar equal protection standard in the application of RLUIPA. *But see Konikov v. Orange County, Florida,* 410 F.3d 1317 (11th Cir.2005) (limiting *Midrash* and finding the metric is "similarly situated" for as-applied challenges).

The Eleventh Circuit has adopted a rule which requires only a showing that the non-religious comparator is an "assembly" or "institution" as those terms are commonly understood. In defining "assembly" and "institution" the Court simply looked to the dictionary definition. *Midrash,* 366 F.3d at 1230.[6] If both the religious and non-religious groups are properly understood as either "assemblies" or "institutions" the Eleventh Circuit then applied classic strict scrutiny analysis. *Primera Iglesia Bautista Hispana of Boca Raton,*

---

**5.** "This case doesn't have to be as complicated as we have made it. We alleged multiple causes of action. Our strongest claim is under B1 of RLUIPA, the equal terms provision. That provision says if a municipality applies its land use laws in a way that treats a non-religious assembly, one, on better than equal terms with a religious assemble, the church, they violate federal law." (Nov. 6, 2008 Hearing Tr. 63:8–12.)

**6.** The Eleventh Circuit found that:
An "assembly" is "a company of persons collected together in one place [usually] and usually for some common purpose (as deliberation. and legislation, worship, or social entertainment)," Webster's 3d New Int'l Unabridged Dictionary 131 (1993); or "[a] group of persons organized and united for some common purpose." Black's Law Dictionary 111 (7th ed. 1999). An institution is "an established society or corporation: an establishment or foundation esp. of a public character," Webster's 3d New Int'l Unabridged Dictionary 1171 (1993); or "[a]n established organization, esp. one of a public character...." Black's Law Dictionary 801 (7th ed. 1999).
*Midrash,* 366 F.3d at 1230–1231.

450 F.3d 1295, 1308 (11th Cir.2006) (quoting *Midrash*, 366 F.3d at 1232).[7]

The Third Circuit has disagreed with the Eleventh Circuit's reading of the statute finding that it "would lead to the conclusion that Congress intended to force local governments to give any and all religious entities a free pass to locate wherever any secular institution or assembly is allowed." *Lighthouse Institute for Evangelism, Inc. v. City of Long Branch,* 510 F.3d 253, 268 (3d Cir.2007). Therefore, the Third Circuit reasoned,

> [U]nder the Eleventh Circuit's interpretation, if a town allows a local, ten-member book club to meet in the senior center, it must also permit a large church with a thousand members—or, to take examples from the Free Exercise caselaw, it must permit a religious assembly with rituals involving sacrificial killings of animals or the participation of wild bears—to locate in the same neighborhood regardless of the impact such a religious entity might have on the envisioned character of the area.

*Id.*

Setting forth their own analysis, the Third Circuit held that "a religious plaintiff under the Equal Terms Provision must identify a better-treated secular comparator that is similarly situated in regard to the *objectives* of the challenged regulation." *Id.* (emphasis added). This rule, they reasoned, was more consistent with Congressional intent, which was "to codify the existing jurisprudence interpreting the Free Exercise Clause." *Id.* at 264 (*citing* 146 Cong. Rec. S7774 (July 27, 2007) (Senate Sponsors' statement)). "Under Free Exercise cases, the decision whether a regulation violates a plaintiff's constitutional rights hinges on a comparison of how it treats entities or behavior that have the same objectives." *Id.* at 265.

As an example of the application of Free Exercise analysis, the Third Circuit relied on the Supreme Court's opinion in *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah* in which a church and its congregants practicing the Santeria religion, which employs animal sacrifice as one of its principal forms of devotion, challenged under the Free Exercise Clause city resolutions enacted by emergency session., which (among other things) noted city residents' "concern" over religious practices inconsistent with public morals, peace, or safety, and declared the city's "commitment" to prohibiting such practices, including the killing of animals not for consumption "unnecessarily or cruelly". 508 U.S. 520, 113 S.Ct. 2217, 124 L.Ed.2d 472 (1993). By the Third Circuit's interpretation, "the reason the ordinance [in *Lukumi* ] was suspect was not merely because it allowed secular versions of the religious behavior it prohibited, but because both behaviors impacted the city's declared goals in the same way. The unequal treatment of equally detrimental behaviors is what caused the violation of the Free Exercise clause." *Lighthouse Institute for Evangelism,* 510 F.3d at 265 (3d Cir.2007). Therefore, applying RLUIPA, "[t]he impact of the allowed and forbidden behaviors must be examined in light of the purpose of the regulation." *Id.* And, "when a government permits secular exemptions to an otherwise generally applicable government regulation, the Free Exercise Clause

---

**7.** The Eleventh Circuit decided to apply strict scrutiny, despite the fact that the strict scrutiny language does not appear in the Equal Terms provision, because it observed that, according to legislative history, "RLUIPA's equal terms provision codifies the Smith–Lukumi line of [Free Exercise] precedent," which imposes strict scrutiny "where a law fails to similarly regulate secular and religious conduct implicating the same government interests." *Midrash,* 366 F.3d at 1232.

[and, therefore, RLUIPA] requires that the government accord equal treatment to religion-based claims for exemptions that would have a similar impact on the protected interests." *Id.*

Following a determination that a land-use regulation treats religious assemblies or institutions on less than equal terms with nonreligious assemblies or institutions (that are no less harmful to the governmental objectives in enacting the regulation), that regulation—without more—fails under RLUIPA. *Id.* at 269. The Third Circuit analysis finds that a strict liability standard applies. *Id.*

The final Circuit to weigh in on the meaning of Equal Terms is the Seventh Circuit which likewise held that "under RLUIPA § 2(b) (1) a plaintiff need not demonstrate disparate treatment between two institutions similarly situated in all relevant respects". *Vision Church v. Village of Long Grove*, 468 F.3d 975, 1003 (7th Cir.2006). That Circuit addressed equal terms in a case involving a religious group, the Vision Church, that was denied a special use permit to allow construction of a church on its property.[8] The Church pointed to nearby elementary schools as a secular comparator. But, the Seventh Circuit held that the schools were "not a valid comparator [ ] because the rezoning process is an entirely different form of relief from obtaining a variance." *Id.* at 1003. Other than that, the Seventh Circuit has given little guidance regarding the interpretation of Equal Terms except to say that, "[t]he equal-terms section is violated whenever religious land uses are treated worse than comparable nonreligious ones, whether or not the discrimination imposes a substantial burden on the religious uses."

*Digrugilliers v. Consolidated City of Indianapolis*, 506 F.3d 612, 616 (7th Cir. 2007) (Posner, J.).

The Court need not reach one definitive interpretation of Equal Terms as, under any reading, the City has treated the Third Church of Christ, Scientist on less than equal terms than other non-religious comparators.

### 1. The Challenged Land-Use Determinations

The provision of the Zoning Resolution primarily at issue in this litigation is the City's definition of "accessory use." The provision reads, in relevant part, that an accessory use "is a use which is clearly incidental to, and customarily found in connection with, such principal use". (ZR 12:10, Accessory Use (b)). The Church argues that its "extensive religious activities are the primary use of the building." (Pl. Supp. Mem. of Law at 10.) They argue that, "[c]atering is the incidental means the Church chose to accomplish its principal end: to preserve the Building as a place of worship." (*Id.*) The City argues that "the catering use by the Rose Group at plaintiff's building is not an 'accessory use' at all, as it is not 'incidental to' plaintiff's use of the building by any stretch of the imagination." (Def. Mem. of Law at 9.) Rather, the City argues, "unlike any catering at the nonreligious institutions, the Rose Group has essentially taken over plaintiff's building and is operating as a commercial event space." (*Id.*)

As an initial matter, the Court is troubled by the seemingly arbitrary way in which the Zoning Resolution may be enforced, given the difficulty Deputy Commissioner Arnold had articulating any

---

**8.** The permit was denied after the church had first applied for voluntary annexation to the Village of Long Grove, failed to reach an agreement with the Village, and then was involuntarily annexed by the Village. The Village also then enacted a municipal Public Assembly Ordinance limiting the kind of church that could be built.

consistent set of standards for her determination in this case. *See supra* at 9; *Petra Presbyterian Church v. Village of Northbrook,* 489 F.3d 846, 851 (7th Cir. 2007) (Posner, J.) (describing another case in which "the denial was so utterly groundless as to create an inference of religious discrimination, so that the case could equally have been decided under the 'less than equal terms' provision of RLUIPA").

Additionally, the Court notes that it is problematic that the City's decision to withdraw pre-consideration relied so heavily on the City's perceived level of religious activity at the Church. (*See e.g.* Tr. Arnold Dep. at 110:15–21.) One of the reasons cited by the City for their determination that the catering was not an accessory use was "the relationship to the virtually non-existent primary use." (*Id.* at 113:20–21.) Deputy Commissioner Arnold testified that the Church's "activities are so diminished relative to the activities of the catering establishment that I think one would be hard-pressed to say that the church remains the primary use of this property." (*Id.* at 114:2–7.) This fact is troubling because it suggests that smaller religious groups could be treated less favorably under the Zoning Resolution than larger, more popular congregations. In addition, to the extent RLUIPA is intended to incorporate at least some Free Exercise jurisprudence, it is without question that, " '[t]he free exercise of religion means, first and foremost, the right to believe and profess whatever religious doctrine one desires,' [and] courts are not permitted to inquire into the centrality of a professed belief to the adherent's religion or to question its validity in determining whether a religious practice exists." *Fifth Ave. Presbyterian Church v. City of New York,* 293 F.3d 570, 574 (2d Cir.2002) (*quoting Smith,* 494 U.S. at 886–87, 110 S.Ct. 1595). There is no question that the members of the Third Church of Christ, though diminished in numbers, are no less deserving of protection.

That being said, it is also evident that the Zoning Resolution requires the City to determine a primary use relative to an accessory use of the site. (ZR 12–10; Black's Law Dictionary (8th ed. 2004) defining incidental as "[s]ubordinate to something of greater importance; having a minor role.") In addition, the New York Court of Appeals has affirmed a loose standard for making the accessory use determination. *New York Botanical Garden v. Board of Standards and Appeals of City of New York,* 91 N.Y.2d 413, 420, 671 N.Y.S.2d 423, 694 N.E.2d 424 (1998) (holding that "[w]hether a proposed accessory use is clearly incidental to and customarily found in connection with the principal use depends on an analysis of the nature and character of the principal use of the land in question in relation to the accessory use, taking into consideration the over-all character of the particular area in question.") Finally, the Circuit has cautioned that:

> [F]ederal courts should not become zoning boards of appeal to review nonconstitutional land use determinations by the [C]ircuit's many local legislative and administrative agencies. Local zoning boards, subject to direct oversight by state courts, are in a far better position than are the federal courts to balance the needs of their communities with those of individuals seeking development.

*Harlen Associates v. Incorporated Village of Mineola,* 273 F.3d 494, 502 (2d Cir. 2001).

The Court need not reach the question of whether Plaintiff's use of the building was indeed "accessory" because the Equal Terms provision is squarely implicated by the City's decision to revoke it's earlier-

granted pre-consideration for the Church when other food-service and catering businesses, associated with non-religious groups, operating in the same neighborhood as Plaintiff, also in violation of the Zoning Resolution, were given only a "Notice of Violation."

### 2. The Unequal Enforcement of Land–Use Violations by the City

The City argues that the secular comparators identified by the Church "do not use their buildings in a way that is comparable to plaintiff's use of it's building". (Def. Mem. of Law at 9.) It further argues that "while accessory use catering may be occurring at [ ] nonreligious institutions, it is not because the City has 'treated' them differently. That is, insofar as DOB has not been requested to approve that accessory use and has not approved that use, the City has not in fact 'treated' those non-religious institutions one way or the other." (Def. Mem. of Law at 10–11.)

While that may have been true at the early stages of this litigation when their Memorandum was written, it is no longer the case. This litigation has brought to the City's attention violations at two of the Plaintiff's neighbors: the Beekman Co-op ("the Beekman") and the Regency Hotel ("the Regency"). Both institutions allow their spaced to be used for revenue-generating catered social events in violation of their Certificates of Occupancy.[9] (Brennan Supp. Decl. at ¶¶ 91–100; 101–104.) The City, now aware of these violation, has issued a "Notice of Violation" to both institutions. (Tr. Hearing Nov. 6, 2008 19:13–20.) However, the City concedes that a "Notice of Violation" is "very much" "removed" from a total revocation of permission. (*Id.* 53:4–7.)

**9.** In both cases, the uses do not properly conform as "accessory uses" to their primary use an "apartment hotel."

### 3. The Application of Equal Terms to the Facts of this Case

■ Under either the Third or the Eleventh Circuit's formulation of the Equal Terms analysis Plaintiff would prevail. Starting with the Third Circuit's analysis, the threshold issue is whether the religious and non-religious comparators are subject to regulations, that while potentially different, have the same objectives; "the impact of the allowed and forbidden behaviors must be examined in the light of the purpose of the regulation." *Lighthouse,* 510 F.3d at 265. Both the Plaintiff and the non-religious comparators in this case are subject to the New York City Zoning Resolution, and both the Beekman and the Church (located across the street from one another), are zoned in a residential district. All of them are seeking to have their catering or food-service uses categorized as accessory uses to their principal uses. But, most importantly, the City's purpose in regulating the zoning in those areas is the same across the board: "to promote and protect public health, safety and general welfare." ZR Art. 1, Preamble. The City has also set forth a lengthy list of the purposes of residence districts, including R10 zoned districts, none of which apply uniquely to the Beekman or Regency's restaurants and catering establishments compared with that of the Church. *See* ZR Art. II, Ch. 1, 21–00 and 21–15. Therefore, because both secular groups were issued a Notice of Violation only and the Church's pre-consideration was revoked entirely, prohibiting it from holding any catered social events, the Third Circuit analysis would have this Court apply a strict liability standard and find a violation of RLUIPA's Equal Terms provision.

The Church would likewise prevail under the Eleventh Circuit's jurisprudence. That analysis begins by asking whether both comparators are properly understood as "assemblies" or "institutions." The Eleventh Circuit defined an "institution" as "an established society or corporation" relying on Webster's 3d New Int'l Unabridged Dictionary 1171 (1993). *Midrash,* 366 F.3d at 1230–1231. Therefore, certainly as to the Beekman, the comparison is proper because the Beekman is a corporation under New York law. Moving on, the Eleventh Circuit would apply strict scrutiny in the case of "discriminatory application of a facially neutral, generally applicable statute." *Primera Iglesia,* 450 F.3d at 1310; *Konikov,* 410 F.3d at 1327–29.[10] Accordingly, the City must show that it has a "compelling interest" in applying the zoning resolution more harshly to the Church than to the secular groups. *Konikov,* 410 F.3d at 1329. The only justifications offered by the City are that no complaints have been logged against the Beekman or the Regency for their accessory use of their buildings and that the catered events at the Church could potentially host a greater number of people than the other buildings. (Brennan Supp. Decl. at ¶¶ 95, 100, 105.) These are not "compelling" interests. As already noted, the Court is concerned about the City's practice of looking into zoning violations only when a complaint is made because such a practice can lead to the unfair targeting of unpopular groups. Further, relying on the fact that the Church has the space available to host very large events is not narrowly tailored or compelling when the City could have worked with the Church to ensure that catered events accorded with the City's purposes in regulating a residential district. Accordingly, even under the Eleventh Circuit analysis, Plaintiff would prevail in their Equal Terms claim.

Finally, looking more broadly beyond the jurisprudence of other Circuits, it is clear that the situation presented here is precisely the type of situation RLUIPA was intended to address. In the "Joint Statement of Senator Hatch and Senator Kennedy" on RLUIPA they stated that:

> Churches in general, and new, small, or unfamiliar churches in particular, are frequently discriminated against on the face of zoning codes and also in the highly individualized and discretionary processes of land use regulation.

146 Cong. Rec. S7774–01, S7774. They note that often, "discrimination lurks behind such vague and universally applicable reasons as traffic, aesthetics, or 'not consistent with the city's land use plan.'" 146 Cong. Rec. S7774–01, S7774–S7775. This case presents a land-use determination by the City that treats a small church *on less than equal terms than those* accorded larger non-religious institutions and justifies that decision by pointing to vague standards and noting the very fact that the church is small. (Tr. Arnold Dep. at 19:18–19; 128:7–13). The City's determination to enforce a total revocation of the Church's accessory use, while simultaneously allowing other, neighboring, non-religious groups to conduct the identical use, in violation of their own Certificates of

---

10. In *Primera Iglesia,* the Eleventh Circuit holds that it's decision in *Konikov stands* for the proposition that in an as-applied Equal Tarms challenge that Circuit will engage in a "similarly situated" analysis. *Primera Iglesia,* 450 F.3d at 1311, n. 11. That case found that religious and secular institutions were not similarly situated because "they sought markedly different forms of zoning relief, from different decision-making bodies, under sharply different provisions of local law." *Id.* Even assuming, *arguendo,* that similar analysis should be applied here, the comparators are subject to zoning determinations under analogous provisions of the same zoning resolution, made by the same decision-making body.

Occupancy, without revocation, violates the plain language of the statute.[11] Accordingly, the Court finds Plaintiff is entitled to prevail on the merits of its claim.[12]

### C. Irreparable Harm

■ In order to grant a permanent injunction, the Court must also determine whether the Plaintiff is likely to suffer irreparable harm. *Roach v. Morse*, 440 F.3d 53, 56 (2d Cir.2006) ("[t]o obtain a permanent injunction, a plaintiff must succeed on the merits and show the absence of an adequate remedy at law and irreparable harm if the relief is not granted") (internal quotations omitted); *Rodriguez v. DeBuono*, 175 F.3d 227, 235 n. 9 (2d Cir. 1999) (per curiam) ("a showing of irreparable harm is required for the imposition of any injunctive relief, preliminary or permanent") (internal quotation marks omitted). To establish irreparable harm, the injury alleged "must be one requiring a remedy of more than mere money damages." *Tucker Anthony Realty Corp. v. Schlesinger*, 888 F.2d 969, 975 (2d Cir. 1989); *Ford v. Reynolds*, 316 F.3d 351, 355 (2d Cir.2003).

■ There is no question that the Church faces irreparable harm were the Court to deny it's Motion for a Permanent Injunction. The Church would have to sell the Building because it would be unable to maintain its operating expenses, absent the contract with the Rose Group. (Draper Supp. Decl. at ¶ 24.) The deprivation of an interest in real property constitutes irreparable harm. *Tioronda, LLC. v. New York*, 386 F.Supp.2d 342, 350 (S.D.N.Y. 2005). The Church building was constructed for the Church over eighty years ago. The Church possesses a unique interest in its place of worship that cannot be remedied by an award of compensation or a monetary reward. *JSG Trading Corp. v. Tray–Wrap, Inc.*, 917 F.2d 75, 79 (2d Cir. 1990).

### III. Scope of the Injunction

Rule 65 of the Federal Rules of Civil Procedure provides that an injunction must "describe in reasonable detail, and not by reference to the complaint or other document, the act or acts sought to be restrained." Fed.R.Civ.P. 65(d). "Although Rule 65 as a whole is entitled 'Preliminary Injunctions,' it seems plain that Rule 65(d) describes the permissible form and scope of [any type of] injunction, whether it be a preliminary, permanent, or a temporary restraining order." *Goldic Electrical Inc. v. Loto Corp. U.S.A.*, 27 Fed.Appx. 71, 74 (2d Cir.2001) (citations omitted).

Accordingly, for the reasons stated herein, the City of New York and Patricia Lancaster in her official capacity as Commissioner of the Department of Buildings,

---

**11.** The City has conceded that it was not the nature of the use, catering, that caused the revocation of the pre-consideration. (Tr. Arnold Dep. at 109:17–23). Therefore, it stands to reason that/ even under the City's own interpretation of the Zoning Resolution, a small church could still have some small amount of catering that was accessory. However, the City has given the Church no guidance as to what activity that could be. (*Compare* Tr. Arnold Dep. 130:20–131:3 *with* Brennan Supp. Decl. at 104, proposing suggestions for the Regency Hotel to conform its activity to the Zoning Resolution.) The City's decision to revoke pre-consideration for *all* catering suggests that religious discrimination is a factor. (*See* Tr. Arnold Dep. at 157:10–24.)

**12.** Because the Court finds that Plaintiff is entitled to prevail on the merits of its RLUIPA Equal Terms claim, the Court need not consider Plaintiff's Equal Protection Claim or First Amendment Claim. *See Higazy v. Templeton*, 505 F.3d 161, 179 (2d Cir.2007) (noting that "principles of judicial restraint caution us to avoid reaching constitutional questions when they are unnecessary' to the disposition of a case.")

are HEREBY PERMANENTLY EN-JOINED from revoking the earlier-issued accessory use approval for the Plaintiff to hold catered social events in its premises at 583 Park Avenue pursuant to a contract with a third party.

## IV. CONCLUSION

For the reasons stated herein. Plaintiff's Motion for a Preliminary Injunction, deemed to be a Motion for a Permanent Injunction, is GRANTED, enjoining the City from enforcing its revocation of preconsideration that catered social events at 583 Park Avenue are an accessory use to the community facility, the Third Church of Christ, Scientist.

The Clerk of the Court is directed to terminate all pending motions and close the docket in this case.

SO ORDERED.