12-1057(L)
*Chabad Lubavitch of Litchfield v. Litchfield Historic District Commission*

## UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

August Term 2013

(Argued: September 16, 2013      Decided: September 19, 2014)

Nos. 12-1057-cv (Lead), 12-1495-cv (Con)
_____

CHABAD LUBAVITCH OF LITCHFIELD COUNTY, INC., JOSEPH EISENBACH,

*Plaintiffs-Appellants–Cross-Appellees,*

UNITED STATES OF AMERICA,

*Plaintiff,*

- v. -

LITCHFIELD HISTORIC DISTRICT COMMISSION, BOROUGH OF LITCHFIELD,
CONNECTICUT, GLENN HILLMAN, KATHLEEN CRAWFORD,

*Defendants-Appellees–Cross-Appellants,*

TOWN OF LITCHFIELD, CONNECTICUT, DOE, POLICE DOG, WENDY KUHNE,

*Defendants.[*]*

_____

Before:      WALKER, LIVINGSTON, and CHIN, *Circuit Judges.*

---

[*] The Clerk of Court is directed to amend the caption as set forth above.

Chabad Lubavitch of Litchfield County, Inc. ("Chabad") appeals from the February 21, 2012 judgment of the United States District Court for the District of Connecticut (Hall, *C.J.*) denying its motion for partial summary judgment and granting the defendants' motion for summary judgment on each of the Chabad's claims, brought pursuant to 42 U.S.C. §§ 1983, 1985, and 1986; the Religious Land Use and Institutionalized Persons Act ("RLUIPA"), 42 U.S.C. § 2000cc *et seq.*; and Connecticut state law, and stemming from the denial of the Chabad's application to alter its property, located in the Borough of Litchfield's historic district. Because we conclude that the district court applied erroneous legal standards to the Chabad's claims under RLUIPA's substantial burden and nondiscrimination provisions, we **VACATE** the grant of summary judgment in the defendants' favor on these claims and **REMAND** them for further consideration consistent with this opinion. By contrast, we **AFFIRM** the grant of summary judgment in the defendants' favor on the remainder of the Chabad's claims, largely due to the Chabad's failure adequately to brief these claims.

Rabbi Joseph Eisenbach ("Rabbi Eisenbach") appeals from the June 20, 2011 order of the district court dismissing his claims, coextensive with the Chabad's, for lack of standing. Because we conclude that the district court erred in finding that Rabbi Eisenbach lacked standing under RLUIPA, we **VACATE** the dismissal of his claims on that ground and **REMAND** for consideration whether he nonetheless failed to state a claim. However, we **AFFIRM** the dismissal of Rabbi Eisenbach's remaining claims for failure adequately to brief these claims.

Accordingly, the February 21, 2012 judgment is **VACATED AND REMANDED IN PART** and **AFFIRMED IN PART**, and the June 20, 2011 order is **VACATED AND REMANDED IN PART** and **AFFIRMED IN PART**.

FREDERICK H. NELSON (Kenneth R. Slater, Jr., Halloran & Sage, LLP, Hartford, CT, *on the brief*), American Liberties Institute, Orlando, FL, *for Plaintiffs-Appellants–Cross-Appellees.*

C. SCOTT SCHWEFEL, Shipman, Shaiken & Schwefel LLC, West Hartford, CT, *for Defendants-*

*Appellees–Cross-Appellants Litchfield Historic Commission and Borough of Litchfield, Connecticut.*

JAMES STEDRONSKY, Stedronsky & D'Andrea, LLC, Litchfield, CT, *for Defendants-Appellees–Cross-Appellants Glenn Hillman and Kathleen Crawford.*

April J. Anderson, Jessica Dunsay Silver, U.S. Department of Justice, Civil Rights Division, Washington, DC, *for Amicus Curiae United States of America.*

Kevin T. Snider, Pacific Justice Institute, Sacramento, CA, *for Amicus Curiae Pacific Justice Institute.*

DEBRA ANN LIVINGSTON, *Circuit Judge*:

The Chabad Lubavitch of Litchfield County, Inc. ("Chabad"), a Connecticut membership corporation founded and currently presided over by Rabbi Joseph Eisenbach ("Rabbi Eisenbach"), purchased property in the Borough of Litchfield's Historic District with the intention of expanding the existing building on the property to accommodate the Chabad's religious mission. Pursuant to Connecticut state law, the Chabad applied to the Borough of Litchfield's Historic District Commission ("HDC") for leave to undertake its desired modifications. However, following multiple meetings on and amendments to the Chabad's proposal, the HDC denied the application with leave to submit an amended proposal consistent

with enumerated conditions. In this ensuing suit, the Chabad and Rabbi Eisenbach (collectively, the "plaintiffs") assert that the Borough of Litchfield, the HDC, and HDC members Glenn Hillman ("Hillman") and Kathleen Crawford ("Crawford") (collectively, the "defendants") abridged their rights under 42 U.S.C. §§ 1983, 1985, and 1986; the Religious Land Use and Institutionalized Persons Act ("RLUIPA"), 42 U.S.C. § 2000cc *et seq.*; and Connecticut state law by denying the application.[1] They seek damages, injunctive and declaratory relief, attorneys' fees, and the appointment of a federal monitor.

On the defendants' motion to dismiss for lack of subject matter jurisdiction, the district court (Hall, *C.J.*) dismissed Rabbi Eisenbach's claims for lack of standing, citing the Rabbi's want of a sufficient property interest under RLUIPA and his failure to distinguish his claims from the Chabad's under federal and state law. *Chabad Lubavitch of Litchfield Cnty., Inc. v. Borough of Litchfield*, 796 F. Supp. 2d 333, 338-39 (D. Conn. 2011) [hereinafter *Chabad I*]. Subsequently, following the Chabad's

---

[1] The Chabad and Rabbi Eisenbach did not name the Town of Litchfield, Connecticut as a defendant in the Second Amended Complaint, following the Town's motion to dismiss the claims against it. Further, the plaintiffs dropped their claims against certain Doe defendants in the Third Amended Complaint. On appeal, a panel of this Court also dismissed plaintiffs' appeal as to the claims against HDC member Wendy Kuhne as a defendant, on Kuhne's motion. *See* U.S.C.A. No. 12-1057, doc. 182. Finally, while the United States intervened as a plaintiff below, it did so only to defend the constitutionality of RLUIPA, an issue not raised on appeal. Therefore, the United States appears here only as *amicus curiae*.

4

motion for partial summary judgment and the defendants' motion for summary judgment, the district court ruled in favor of the defendants. Significantly, the district court concluded that Connecticut's statutory scheme governing historic districts is "neutral and generally applicable" and, consequently, that the HDC's denial of the Chabad's application could not "as a matter of law" impose a substantial burden on the Chabad's religious exercise under RLUIPA's substantial burden provision. *Chabad Lubavitch of Litchfield Cnty., Inc. v. Borough of Litchfield*, 853 F. Supp. 2d 214, 225 (D. Conn. 2012) [hereinafter *Chabad II*]. The district court also held that the Chabad's failure to identify a religious institution that was more favorably treated than and "identical in all relevant respects" to the Chabad barred the Chabad's claim under RLUIPA's nondiscrimination provision. *Chabad II*, 853 F. Supp. 2d at 229-31.

On appeal, we conclude that the district court erred in dismissing Rabbi Eisenbach's RLUIPA claims for lack of standing. Accordingly, we vacate the district court's June 20, 2011 ruling insofar as it concerns Rabbi Eisenbach's standing under RLUIPA and remand for consideration, instead, whether Rabbi Eisenbach failed to state a claim under RLUIPA. We affirm the remainder of that judgment due to Rabbi Eisenbach's failure to brief his remaining claims. Additionally, we conclude

that the HDC's review of the Chabad's application was an "individual assessment" subject to RLUIPA's substantial burden provision and that the Chabad need not cite an "identical" comparator to establish a claim under RLUIPA's nondiscriminaton provision. Accordingly, we vacate the district court's February 21, 2012 judgment insofar as it concerned these RLUIPA claims and remand for consideration whether these claims survive summary judgment under an analysis consistent with this opinion. We affirm the remainder of the district court's February 21, 2012 judgment, albeit largely due to the Chabad's failure to brief most of its remaining claims.

# BACKGROUND

## A. Facts[2]

The Chabad, a Connecticut membership corporation, and Rabbi Eisenbach, president of the Chabad, offer weekly religious and other services to its Orthodox Hasidic parishioners in the Litchfield area. Prior to the events at issue, the Chabad rented space to provide these services, at a cost of thousands of dollars per year. Deeming the rented space inadequate to practice its faith and accommodate its religious mission, the Chabad in 2005 purchased a property at 85 West Street in the

---

[2] In review of the district court's grant of summary judgment to the defendants, we view the facts in the light most favorable to the Chabad. *Ne. Research, LLC v. One Shipwrecked Vessel*, 729 F.3d 197, 200 (2d Cir. 2013).

6

Borough of Litchfield to serve as its new place of worship. The property, located in the Litchfield Historic District – once deemed to be "[p]robably the finest surviving example of a typical late 18th century New England town" – boasts a two-story, "stick-style" Victorian residence constructed in the 1870s encompassing 2,600 square feet and a basement. Known as the "Deming House," the building was constructed as a residence by the grandson of a prominent Revolutionary War-era Litchfield resident but, by the time of the Chabad's purchase, had been altered to accommodate a commercial establishment.

In accordance with Connecticut's statutory scheme governing development in historic districts, the Chabad sought leave to alter 85 West Street to meet its needs. Specifically, Connecticut General Statutes § 7-147d(a) directs that "[n]o building or structure shall be erected or altered within an historic district until after an application for a certificate of appropriateness as to exterior architectural features has been submitted to the historic district commission and approved by said commission."[3] The HDC, established in 1989 pursuant to this scheme, reviews such applications for the Litchfield Historic District. The Connecticut General Statutes

---

[3] "Nonprofit institutions of higher education" are exempted from this requirement. Conn. Gen. Stat. § 7-147k(b).

empower the HDC to approve or deny applications following notice and a public hearing, *see id.* §§ 7-147c, 7-147e, and direct that, when weighing applications to alter exterior architectural features, the HDC consider, "in addition to any other pertinent factors, the historical and architectural value and significance, architectural style, scale, general design, arrangement, texture and material of the architectural features involved and the relationship thereof to the exterior architectural style and pertinent features of other buildings and structures in the immediate neighborhood," *id.* § 7-147f(a).

The HDC first considered the Chabad's application at a pre-hearing meeting on September 6, 2007. The defendants assert that the Chabad's proposed modifications called for a 17,000-square-foot addition to be built at 85 West Street, including administrative offices, classrooms, a nearly 5,000-square-foot residence for Rabbi Eisenbach and his family, an indoor swimming pool, guest accommodations, kitchens, and a ritual bath. Though the Chabad disputes the defendants' characterization of its proposed expansion, it does not specify a smaller footprint. In addition, the Chabad sought to top the property with a clock tower featuring the Star of David and to incorporate several external elements that would restore some of the property's period details. The Chabad contends that, at that meeting, HDC

8

member Wendy Kuhne ("Kuhne") voiced her opposition to its application, due in part to the size of the addition and her belief that the Star of David was not "historically compatible with the [Historic] District." Other HDC members, including Crawford, also expressed concerns regarding the size of the addition, with one member urging that "[w]e have to get the public out on this project for the public hearing." At the conclusion of the meeting, the HDC scheduled a second pre-hearing meeting for the following month.

At the second meeting, held on October 18, 2007, the Chabad announced its changes in response to the requested modifications, which included altering the shape of windows and lowering the roof line of the addition. Following the Chabad's presentation, Kuhne commented, "[I]s this all there is?" J.A. 747. Though the Chabad did not object to Kuhne's comments at the meeting, it later requested that she recuse herself from the public meetings and decisionmaking process, which she did. The HDC then bifurcated the hearing process concerning the Chabad's application, reserving the first hearing to address the Chabad's proposed modifications and the second to address whether denial of the Chabad's application would place a "substantial burden" on its religious exercise. Following the first public hearing, held on November 15, 2007, the Chabad altered its proposal to,

9

among other changes, lower the foundation of its addition, use alternative exterior building material, reduce the height of the Star of David finial atop the clock tower, and reconstruct a front porch that had been removed during an earlier renovation. At the second hearing, held on December 17, 2007, the Chabad asserted its need for a larger structure, but did not disclose the size of its assembly or the number of students likely to attend religious classes.

The HDC denied the Chabad's application on December 20, 2007. In its written opinion, the HDC catalogued the history and importance of the Deming House to the historic character of the Borough of Litchfield. Per the HDC, the altered but nonetheless distinctively residential structure serves as one of the "last vestiges" of the Borough's residential district, "significant alteration" of which would destroy the "residential character" of the property's environs. As such, the HDC "commended" the Chabad's proposals to rehabilitate the existing structure, but nevertheless denied three of the Chabad's proposed modifications: hanging a double door on the front of the house, incorporating a clock tower, and building an addition on the property. The HDC concluded that the double door would conflict with the house's original design and would require removal of a single door that was "probably the original door of the house." J.A. 330. The HDC deemed the clock

tower "incongruous with the immediate neighborhood and the district as a whole," and found that it would "in one stroke transform[] the house from a residential structure in appearance to an institutional structure." *Id.* Finally, the HDC objected to the size of the proposed addition, which it characterized as "massive" and "nearly 20,000 square f[ee]t," a size "over five times as large as" the Deming House that would "dwarf[] and overwhelm[]" not only the house but also the neighborhood as a whole. J.A. 328, 331.

However, in light of the Chabad's proposed religious use of the property, the HDC also granted accommodations to substitute for the rejected modifications. Specifically, the HDC stated that it would accept a proposal replacing the clear glass currently in the house's front door with stained glass, incorporating a finial with a Star of David atop the house, and including an addition that was no larger than the original structure. The HDC granted the Chabad leave to file an amended application consistent with these conditions. Thereafter, five HDC members voted unanimously to deny the Chabad a certificate of appropriateness, including Hillman. Crawford was not recorded as having cast a vote. The Chabad did not administratively appeal the denial or file an amended application. *See* Conn. Gen. Stat. § 7-147i.

11

## B. Procedural History

The Chabad and Rabbi Eisenbach filed the underlying action in September 2009. In their Third Amended Complaint, filed on April 26, 2010, the plaintiffs asserted that the HDC's denial of the Chabad's application abridged their rights under the First Amendment's Free Exercise, Free Speech, and Free Association Clauses; the Fourteenth Amendment's Equal Protection and Due Process Clauses; RLUIPA's substantial burden, equal terms, and nondiscrimination provisions; as well as provisions of the Connecticut state constitution and the Connecticut Religious Freedom Act ("CFRA"), Conn. Gen. Stat. § 52-571b. The plaintiffs also asserted that the named HDC members conspired to violate and failed to prevent the violation of their civil rights under 42 U.S.C. §§ 1985 and 1986, respectively.

In January 2011, the defendants moved to dismiss Rabbi Eisenbach's claims for lack of standing under Federal Rule of Civil Procedure 12(b)(1).[4] The district court granted this motion on June 20, 2011. The district court first concluded that "RLUIPA requires a plaintiff to hold some property interest that he has attempted to use and which has been threatened by the illegal conduct of the defendant."

_____

[4] In that same motion, the defendants sought judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c), which the district court denied. *See Chabad I*, 796 F. Supp. 2d at 346. The defendants do not contest this ruling.

*Chabad I*, 796 F. Supp. 2d at 338 (citing 42 U.S.C. § 2000cc-5(5)). Because Rabbi Eisenbach's proposed use of the facilities at 85 West Street "[did] not qualify" as such a property interest and his claim of "a right to place a mortgage lien" on the property for unpaid salary "barely warrant[ed] addressing," the district court determined the Rabbi lacked standing to press his claims under RLUIPA. *Id.* at 338-39. In addition, the district court concluded that Rabbi Eisenbach's failure to distinguish his claims from those of the Chabad denied him standing under 42 U.S.C. §§ 1983, 1985, and 1986, the Connecticut constitution, and CFRA. *Id.* at 339.

The Chabad subsequently moved for partial summary judgment on May 14, 2011, and on May 16, 2011, the defendants cross-moved for summary judgment.[5] In February 2012, the district court denied the Chabad's motion and granted the defendants'. Pertinently, the district court found that, because Connecticut General Statutes § 7-147a *et seq.* applies to any entity seeking to <u>alter</u> ~~modify~~ a property in a historic district (save for nonprofit institutions of higher education) it is a neutral law of general applicability and thus could not, as a matter of law, impose a substantial burden on the Chabad's religious exercise, thereby barring the Chabad's

---

[5] Rabbi Eisenbach joined the Chabad's motion, but due to the dismissal of his claims for lack of subject matter jurisdiction, his involvement is not considered here.

claim under RLUIPA's substantial burden provision. *Chabad II*, 853 F. Supp. 2d at 224-25. In addition, the district court concluded that the Chabad's failure to cite a valid secular comparator was fatal to its claim under RLUIPA's equal terms provision, *id.* at 226-29, and that its failure to identify a religious institution that was more favorably treated and identically situated to the Chabad precluded its claim under RLUIPA's nondiscrimination provision, *id.* at 229-31. Finally, the district court rejected the Chabad's remaining constitutional and state law claims for many of the same reasons described above. *Id.* at 231-37. Because the district court granted summary judgment to the defendants on the merits, it did not address the HDC members' asserted entitlement to either absolute or qualified immunity. *Id.* at 237. The Chabad and Rabbi Eisenbach appealed both of the district court's rulings, and the defendants cross-appealed.

**DISCUSSION**

We review *de novo* a district court's grant of a motion to dismiss for lack of standing. *Fed. Treasury Enter. Sojuzplodoimport v. SPI Spirits Ltd.*, 726 F.3d 62, 71 (2d Cir. 2013). As with any motion to dismiss, we "accept[] all well-pleaded allegations in the complaint as true [and] draw[] all reasonable inferences in the plaintiff's

favor." *Bigio v. Coca-Cola Co.*, 675 F.3d 163, 169 (2d Cir. 2012) (internal quotation marks omitted) (second alteration in original). "To survive a motion to dismiss, the complaint must plead 'enough facts to state a claim to relief that is plausible on its face.'" *Fed. Treasury Enter. Sojuzplodoimport*, 726 F.3d at 71 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is facially plausible when the complaint contains "'factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Id. (*quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).

We also review *de novo* a district court's grant of summary judgment, again drawing all factual inferences in favor of the non-moving party. *See Miller v. Wolpoff & Abramson, L.L.P.*, 321 F.3d 292, 300 (2d Cir. 2003). Summary judgment is appropriate when there is "no genuine dispute as to any material fact" and the moving party is "entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). There is no "genuine" dispute when "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

**A. The Chabad's RLUIPA Claims**

The Chabad asserts claims under three of RLUIPA's land use provisions: the

15

substantial burden provision, which prohibits substantial government interference with a land use applicant's religious exercise in the absence of a compelling justification, 42 U.S.C. § 2000cc(a)(1); and the equal terms and nondiscrimination provisions, which prohibit unequal treatment of and discrimination against religious assemblies and institutions by a government, *id.* § 2000cc(b)(1)-(2).  We address each in turn.

### 1. The Chabad's RLUIPA Substantial Burden Claim

RLUIPA's substantial burden provision provides:

> No government shall impose or implement a land use regulation in a manner that imposes a substantial burden on the religious exercise of a person, including a religious assembly or institution, unless the government demonstrates that imposition of the burden on that person, assembly, or institution – (A) is in furtherance of a compelling governmental interest; and (B) is the least restrictive means of furthering that compelling governmental interest.

42 U.S.C. § 2000cc(a)(1).  The provision applies only when a substantial burden (1) occurs attendant to a federally funded program; (2) implicates interstate or international commerce or commerce with Indian tribes; or (3) "is imposed in the implementation of a land use regulation or system of land use regulations, under which a government makes, or has in place formal or informal procedures or practices that permit the government to make, individualized assessments of the

proposed uses for the property involved." *Id.* § 2000cc(a)(2). To establish a claim, a plaintiff bears the burden of demonstrating that at least one of these predicates applies and that the defendant's implementation of a "land use regulation" placed a "substantial burden" on the plaintiff's "religious exercise." 42 U.S.C. § 2000cc-2(b). The burden then shifts to the defendant to demonstrate that it "acted in furtherance of a compelling governmental interest and that its action is the least restrictive means of furthering that interest." *Id.* at 353 (citing 42 U.S.C. § 2000cc-2(b)).

We agree with the Chabad that RLUIPA's substantial burden provision applies in this case under the statute's "individualized assessment" predicate.[6] Under the "plain meaning" of 42 U.S.C. § 2000cc(a)(2)(C), this predicate is satisfied when "the government may take into account the particular details of an applicant's proposed use of land when deciding to permit or deny that use." *Guru Nanak Sikh Soc'y v. Cnty. of Sutter*, 456 F.3d 978, 986 (9th Cir. 2006). Thus, while the mere application of a neutral and generally applicable zoning law likely would not trigger

---

[6] Although the Chabad's proposed construction of a 17,000-square-foot addition at 85 West Street almost certainly renders RLUIPA applicable under the interstate commerce predicate, *see Westchester Day Sch. v. Vill. of Mamaroneck*, 504 F.3d 338, 354 (2d Cir. 2007) (noting that denial of application to modify property satisfied RLUIPA's interstate commerce predicate because "commercial building construction is activity affecting interstate commerce" (citing *Reich v. Mashantucket Sand & Gravel*, 95 F.3d 174, 181 (2d Cir. 1996))), the district court did not address this predicate and we decline to do so in the first instance.

RLUIPA (at least, not under this predicate), application of a zoning law that permits a governmental entity to consider the applicant's intended use of a property, applying at least partly subjective criteria on a case-by-case basis, likely would. *See id.* at 987; *see also Westchester Day Sch. v. Vill. of Mamaroneck*, 417 F. Supp. 2d 477, 542 (S.D.N.Y. 2006) (noting that application of neutral and generally applicable law "to particular facts" may constitute individualized assessment where such "application does not involve a mere numerical or mechanistic assessment," but instead "involv[es] criteria that are at least partially subjective in nature"), *aff'd*, 504 F.3d 338 (2d Cir. 2007).

RLUIPA's substantial burden provision combats "subtle forms of discrimination" by land use authorities that may occur when "a state delegates essentially standardless discretion to nonprofessionals operating without procedural safeguards." *Sts. Constantine & Helen Greek Orthodox Church, Inc. v. City of New Berlin*, 396 F.3d 895, 900 (7th Cir. 2005). Accordingly, when a governmental entity conducts a "case-by-case evaluation" of a land use application, carrying as it does "the concomitant risk of idiosyncratic application" of land use standards that may permit (and conceal) "potentially discriminatory" denials, RLUIPA applies. *Midrash Sephardi, Inc. v. Town of Surfside*, 366 F.3d 1214, 1225 (11th Cir. 2004) (holding that

18

ordinance permitting such evaluations was "quintessentially an 'individual assessment' regime" under RLUIPA); *see also* Dep't of Justice Policy Statement on the Land-Use Provisions of RLUIPA at 6 (Sept. 22, 2010) [hereinafter "DOJ Statement"], *available at* http://www.justice.gov/crt/rluipa_q_a_9-22-10.pdf (noting that, due to idiosyncracies of zoning law, "*solely* . . . mechanical, objective" assessments exempt from this predicate would be "extremely rare").

The broad reach of this predicate is no accident. In regulating individualized assessments by government of the proposed uses to which property is to be put, the substantial burden provision codifies principles announced in *Sherbert v. Verner*, 374 U.S. 398 (1963), insofar as that case held that a "[government] system for granting individual exemptions from a general rule must have a compelling reason to deny a religious group an exemption that is sought on the basis of hardship." *Sts. Constantine & Helen Greek Orthodox Church, Inc.*, 396 F.3d at 897 (discussing individualized assessment predicate). Because "almost all" land use regimes implicate such "individualized" review, *see River of Life Kingdom Ministries v. Vill. of Hazel Crest*, 611 F.3d 367, 381 (7th Cir. 2010) (en banc) (Sykes, *J.*, dissenting), almost all "impos[itions]" or "implementation[s]" of land use regimes, 42 U.S.C. § 2000cc(a)(2)(C), will satisfy this predicate.

Under this rubric, Connecticut's statutory scheme undeniably demands an individual assessment of applications to alter historic properties. While Connecticut General Statutes § 7-147d(a) requires that nearly all entities seeking to modify a property in a historic district "shall" obtain a certificate of appropriateness, the scheme also requires that local commissions implement that general rule by applying loosely defined and subjective standards to discrete applications. *See id.* §§ 7-147c, 7-147e, 7-147f. To that end, § 7-147e commands that commissions "hold a public hearing upon *each* application." *Id.* § 7-147e(a) (emphasis added). Similarly, § 7-147f directs that commissions, when weighing an application, must determine whether "*the proposed* erection, alteration or parking will be appropriate." *Id.* § 7-147f(a) (emphasis added). And, in assessing the appropriateness of a modification, commissions are further directed to consider such criteria as "the historical and architectural value and significance" of the modification, its "architectural style, scale, general design, arrangement, texture and material" used, "the relationship [of . . . ] the exterior architectural style" to the neighborhood – and "any other pertinent factors." *Id.* Even the district court found these standards to be "subjective in nature," but nonetheless deemed the statutory scheme to be immune from substantial burden analysis. *See Chabad II*, 853 F. Supp. 2d at 235. In

20

the absence of more definite standards limiting the HDC's discretion in reviewing applications, we disagree. *See* DOJ Statement at 6.[7]

Were there any doubt as to the type of assessment at issue, even a cursory review of the HDC's consideration of the Chabad's application confirms that the process was patently individualized. The HDC probed the Chabad's proposed window and roof measurements, door selections, building materials, roof adornments, and glass type, and imposed a size limitation on the Chabad's development based on a tailored review of surrounding properties. Moreover, the HDC conducted this inquiry without the guidance of laws or regulations that dictated the specific metes and bounds either of its inquiry or of the conditions it imposed. Regardless of whether the HDC's inquiry was defensible, it was thus at

---

[7] Connecticut General Statutes § 7-147f(b) does bar consideration of the so-called "interior arrangement or use" of a property, a limitation which may be typical of many historic preservation laws. However, this limitation is of no moment to our consideration of the scheme under RLUIPA. While the "individualized assessment" predicate reaches only review of the "proposed uses" for a property, 42 U.S.C. § 2000cc(a)(2)(C), RLUIPA contemplates "land use" as broadly encompassing the "use or development of land," 42 U.S.C. § 2000cc-5(5) (defining "land use regulation" as "a zoning or landmarking law, or the application of such a law, that limits or restricts a claimant's use or development of land (including a structure affixed to land)"). The "development of land" is explicitly regulated by the scheme instated pursuant to Connecticut General Statutes § 7-147a *et seq. See also Roman Catholic Bishop of Springfield v. City of Springfield*, 724 F.3d 78, 98 (1st Cir. 2013) (concluding that RLUIPA substantial burden provision applied to creation of historic preservation district that limited church's ability to alter exterior of its property).

a minimum *individualized*. Because Connecticut's statutory scheme therefore permits – indeed, demands – application of subjective standards to individual land use applications, and because the HDC applied such subjective standards to the Chabad's application, we conclude that the HDC's denial of the Chabad's application resulted from an "individual assessment," triggering RLUIPA's substantial burden provision.[8] The district court consequently erred in determining that the Chabad could not establish a claim under RLUIPA's substantial burden provision "as a matter of law," and we vacate the district court's judgment insofar as it concerns that claim.

In reaching its decision, the district court improperly read our opinion in *Westchester Day School* as holding that, as a matter of law, generally applicable land use regulations may only result in a substantial burden when arbitrarily and capriciously imposed. *See Chabad II*, 853 F. Supp. 2d at 225 (citing *Westchester Day Sch.*, 504 F.3d at 350). This holding would be in tension with the plain language of RLUIPA's substantial burden provision, which in certain instances regulates "burden[s that] result[] from a rule of general applicability" – suggesting that such

---

[8] The defendants effectively concede this point. In one affidavit submitted by the HDC, Rachel Carley, an architectural historian, notes that "[e]ach property [under review] is unique, and each proposal for change introduces a different set of circumstances. For this reason, proposals are always considered case by case." J.A. 317.

22

burdens fall within RLUIPA's cognizance, even when imposed in the regular course. 42 U.S.C. § 2000cc(a)(2)(A), (B). Moreover, such a rule would render the substantial burden provision largely superfluous given RLUIPA's nondiscrimination and equal terms provisions, which regulate overtly discriminatory acts that are often characterized by arbitrary or unequal treatment of religious institutions. *See id.* § 2000cc(b)(1)-(2); *Bethel World Outreach Ministries v. Montgomery Cnty. Council*, 706 F.3d 548, 557 (4th Cir. 2013) ("Requiring a religious institution to show that it has been targeted on the basis of religion in order to succeed on a substantial burden claim would render the nondiscrimination provision superfluous."); *Sts. Constantine & Helen Greek Orthodox Church, Inc.*, 396 F.3d at 900 ("[T]he 'substantial burden' provision backstops the explicit prohibition of religious discrimination in the later section of [RLUIPA], much as the disparate-impact theory of employment discrimination backstops the prohibition of intentional discrimination. If a land-use decision . . . imposes a substantial burden on religious exercise . . . and the decision maker cannot justify it, the inference arises that hostility to religion . . . influenced the decision." (citations omitted)).

Instead, *Westchester Day School* enumerates some of the factors that may be considered to determine whether a substantial burden is imposed, including

whether the law is neutral and generally applicable. In conducting the substantial burden analysis, we considered several factors. *See* 504 F.3d at 352 (stating that the "arbitrary and unlawful nature" of defendant's conduct "support[ed]" a substantial burden claim, while also looking to "other factors"); *see also Fortress Bible Church*, 694 F.3d at 219 (finding that arbitrary and capricious application of land use regulation "bolstered" a substantial burden claim). In addition to the arbitrariness of a denial, our multifaceted analysis considered whether the denial was conditional; if so, whether the condition was itself a substantial burden; and whether the plaintiff had ready alternatives. *See Westchester Day Sch.*, 504 F.3d at 352; *see also Fortress Bible Church*, 694 F.3d at 219 (considering whether rejection of land use application denied plaintiff the "ability to construct an adequate facility" for its religious exercise, or was merely a "rejection of a specific building proposal"). Our sister circuits have contributed additional texture to this analysis. *See, e.g., Bethel World Outreach Ministries*, 706 F.3d at 558 (weighing whether plaintiff had "reasonable expectation" of receiving approval to build church when it bought property and deeming it "significant that the [defendant] has completely prevented [the plaintiff] from building any church on its property"); *Petra Presbyterian Church v. Vill. of Northbrook*, 489 F.3d 846, 851 (7th Cir. 2007) (considering as a factor whether plaintiff "bought

24

property reasonably expecting to obtain a permit," particularly when alternative sites were available); *Midrash Sephardi, Inc.*, 366 F.3d at 1228 (deeming it significant that the plaintiff could operate a church "only a few blocks from" its preferred location). Thus, while we conclude  that the substantial burden provision applies, we leave it to the district court to determine as a question of first instance, *see Dardana Ltd. v. Yuganskneftegaz*, 317 F.3d 202, 208 (2d Cir. 2003),  whether the denial here in fact "impose[d] a substantial burden on the [Chabad's] religious exercise,"[9] 42 U.S.C. § 2000cc(a)(1); *see Fortress Bible Church v. Feiner*, 694 F.3d 208, 219 (2d Cir. 2012) (requiring that the substantial burden have a "close nexus" with religious exercise to be cognizable under RLUIPA); *Westchester Day Sch.*, 504 F.3d at 349 (holding that substantial burden occurs when government "coerces the religious institution to change its behavior" (emphasis omitted)) . We note that, in conducting the substantial burden analysis on remand, the district court should consider, *inter alia*, whether the conditions attendant to the HDC's denial of the Chabad's application themselves imposed a substantial burden on the Chabad's religious exercise, whether feasible alternatives existed for the Chabad to exercise its faith,

---

[9] The parties do not dispute (and it is indisputable) that Connecticut General Statutes § 7-147a *et seq.* constitutes a "land use regulation" under RLUIPA, defined as "a zoning or landmarking law, or application of such a law, that limits or restricts a claimant's use or development of land (including a structure affixed to land)."  42 U.S.C. § 2000cc-5(5).

and whether the Chabad reasonably believed it would be permitted to undertake its proposed modifications when it purchased the property at 85 West Street. The district court should also consider, of course, whether the proposed modifications shared a "close nexus" with and would be consistent with accommodating the Chabad's religious exercise. *See Fortress Bible Church*, 694 F.3d at 219.

### 2. *The Chabad's RLUIPA Equal Terms Claim*

We can address the Chabad's equal terms claim in comparatively short order. RLUIPA's equal terms provision states that "[n]o government shall impose or implement a land use regulation in a manner that treats a religious assembly or institution on less than equal terms with a nonreligious assembly or institution." 42 U.S.C. § 2000cc(b)(1). Under this provision, the plaintiff bears the initial burden to "produce[] *prima facie* evidence to support a claim" of unequal treatment, after which the "government . . . bear[s] the burden of persuasion on any element of the claim." *Id.* § 2000cc-2(b).

Division exists among our sister circuits concerning whether the equal terms provision invariably requires evidence of a "similarly situated" secular comparator to establish a claim and, where such evidence is necessary, on what ground the comparison must be made. *See generally River of Life Kingdom Ministries*, 611 F.3d at

368-71 (en banc majority opinion) (discussing circuits' conflicting approaches); *id.* at 377-78 (Sykes, J., dissenting) (same discussion). We need not enter the fray here, as the Chabad has failed to present sufficient evidence to establish a prima facie equal terms claim under any standard.

In this Court's sole analysis of the equal terms provision, we declined to define "the precise outlines of what it takes to be a valid comparator under RLUIPA's equal-terms provision." *Third Church of Christ, Scientist v. City of New York*, 626 F.3d 667, 669 (2d Cir. 2010). Nevertheless, we noted that "organizations subject to different land-use regimes may well not be sufficiently similar to support a discriminatory-enforcement challenge." *Id.* at 671 (emphasis omitted). In support, we cited *Primera Iglesia Bautista Hispana of Boca Raton, Inc. v. Broward County*, in which the Eleventh Circuit held that a church and school were insufficiently comparable to establish an equal terms claim, given that the properties sought different forms of zoning relief from different land use authorities applying "sharply different" criteria. *See* 450 F.3d 1295, 1311 (11th Cir. 2006). Because the evidence of the church's and school's treatment was thus "consistent with the . . . neutral application of different zoning regulations" – suggesting "*different* treatment, not *unequal* treatment" – the court held that the plaintiff had failed to establish a prima

27

facie equal terms claim. *Id.* at 1313; *see also Vision Church v. Vill. of Long Grove*, 468 F.3d 975, 1003 (7th Cir. 2006) (rejecting equal terms claim, in part, because "the fact that [the religious land use applicant] and the elementary schools were subject to different standards because of the year in which their special use applications were considered compels the conclusion that there was no unequal treatment").

The same is true here; the Chabad has failed to establish a prima facie equal terms claim. Its sole support for its equal terms claim comes in the form of one alleged comparator: the Wolcott Library, a building in Litchfield's Historic District that, according to uncontested evidence submitted by the Chabad, was permitted to construct a "substantial" addition on its property that altered the character of the property from residential to institutional.[10]   However, the Wolcott Library's

---

[10] The Chabad argues that two other properties in Litchfield's Historic District, the Rose Haven Home and the Cramer and Anderson building, should also serve as comparators because additions on those properties were "substantially larger" than the original structures. However, the Chabad's only support for this argument comes from an affidavit submitted by one of its attorneys that cited "research" the attorney performed for the Chabad's application to the HDC. The attorney did not provide any analysis or basis for her conclusion, nor did the Chabad. Because the affidavit failed to show that these contentions could be established at trial by competent evidence, it cannot create a triable issue of fact. *See ABB Indus. Sys., Inc. v. Prime Tech., Inc.*, 120 F.3d 351, 357 (2d Cir. 1997) (citing Fed. R. Civ. P. 56(e)); *see also Jeffreys v. City of New York*, 426 F.3d 549, 554 (2d Cir. 2005) (noting that, to defeat summary judgment, "a nonmoving party must offer some hard evidence showing that its version of the events is not wholly fanciful" (internal quotation marks omitted)); *Bickerstaff v. Vassar Coll.*, 196 F.3d 435, 452 (2d Cir. 1999) ("Statements that are devoid of any specifics, but replete with conclusions, are insufficient to defeat a

28

expansion was approved in 1965 by a different land use authority pursuant to a different land use regime. Specifically, the Board of Warden and Burgesses, the predecessor to the HDC, approved construction of the addition under a law that explicitly barred consideration of "the relative size of buildings." J.A. 192. By contrast, Connecticut General Statutes § 7-147f(a), which guided the HDC's consideration of the Chabad's application, explicitly requires that commissions "shall" consider "scale."

While minor differences in land use regimes may not defeat a comparison under the equal terms provision in all disputes, the centrality of the size of the Chabad's proposed addition to *this* dispute renders the Wolcott Library an inappropriate comparator to support the Chabad's equal terms claim. As such, the Chabad has (at most) established "*different* treatment, not *unequal* treatment." *Primera Iglesia Bautista Hispana*, 450 F.3d at 1313. Because the Chabad has thus failed to identify any evidence that it endured "less than equal" treatment as compared to a secular assembly or institution, we affirm the district court's grant of summary

properly supported motion for summary judgment."). Because the affidavit was so lacking, we agree with the district court that it provided insufficient ground to require further consideration of these comparators at summary judgment.

29

judgment to the defendants on this claim.[11]

### 3. The Chabad's RLUIPA Nondiscrimination Claim

RLUIPA's nondiscrimination provision states that "[n]o government shall impose or implement a land use regulation that discriminates against any assembly or institution on the basis of religion or religious denomination." 42 U.S.C. § 2000cc(b)(2). As with the equal terms provision, the plaintiff bears the initial burden of establishing a prima facie claim, after which the government bears the burden of persuasion on the elements of the nondiscrimination claim. *Id.* § 2000cc-2 (b).

This Court has not previously interpreted the nondiscrimination provision. Nonetheless, the plain text of the provision makes clear that, unlike the substantial burden and equal terms provisions, evidence of discriminatory *intent* is required to establish a claim. *See* 42 U.S.C. § 2000cc(b)(2) (prohibiting discrimination "*on the basis* of religion or religious denomination" (emphasis added)). As such, courts

---

[11]As indicated above, the Chabad did not argue and we do not address whether an equal terms claim may be based solely on an inference of unequal treatment from a law that is facially discriminatory or "'gerrymandered' to place a burden solely on religious, as opposed to nonreligious, assemblies or institutions." *See Primera Iglesia Bautista Hispana*, 450 F.3d at 1308-10. In any event, the scheme under Connecticut General Statutes § 7-147a *et seq.* does not facially discriminate against religious assemblies or institutions, and there is no evidence in the record suggesting that it was enacted with the purpose of doing so.

30

consider the provision have held that the nondiscrimination provision "enshrine[s]" principles announced in *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520 (1993), which cast a jaundiced eye on laws that target religion. *See Midrash Sephardi, Inc.*, 366 F.3d at 1231-32.

*Lukumi* looked to equal protection principles in analyzing whether a law was discriminatory. *See Lukumi*, 508 U.S. at 540 (citing *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266 (1977)). Other courts analyzing RLUIPA's nondiscrimination provision, as well as the related equal terms provision, have similarly looked to equal protection precedent in weighing such claims. *See, e.g.*, *Bethel World Outreach Ministries*, 706 F.3d at 559; *Church of Scientology of Ga., Inc. v. City of Sandy Springs*, 843 F. Supp. 2d 1328, 1370 (N.D. Ga. 2012). We join in employing this approach. RLUIPA, after all, codified "existing Free Exercise, Establishment Clause[,] and Equal Protection rights against states and municipalities" that discriminated against religious land use. *Midrash Sephardi, Inc.*, 366 F.3d at 1239 (discussing the equal terms provision, but also noting that "RLUIPA tailors the nondiscrimination prohibitions [in 42 U.S.C. § 2000cc(b)(1) and (2)] to land use regulations because Congress identified a significant encroachment on the core First and Fourteenth Amendment rights of religious observers"). Accordingly,

establishing a claim under RLUIPA's nondiscrimination provision, as with the Supreme Court's equal protection precedent, requires evidence of "discriminatory intent." *See Arlington Heights*, 429 U.S. at 265 ("Proof of . . . discriminatory intent or purpose is required to show a violation of the Equal Protection Clause.").

This Court has generally recognized three types of equal protection violations: (1) a facially discriminatory law; (2) a facially neutral statute that was adopted with a discriminatory intent and applied with a discriminatory effect (*i.e.,* a "gerrymandered" law); and (3) a facially neutral law that is enforced in a discriminatory manner. *See, e.g., Hayden v. Cnty. of Nassau*, 180 F.3d 42, 48 (2d Cir. 1999); *see also Lukumi*, 508 U.S. at 535 ("Apart from the text, the effect of a law in its real operation is strong evidence of object."). In determining whether a facially neutral statute was selectively enforced, we look to both direct and circumstantial evidence of discriminatory intent, as instructed by the Supreme Court in *Arlington Heights*. *See Southside Fair Hous. Comm. v. City of New York*, 928 F.2d 1336, 1354 (2d Cir. 1991) (citing *Arlington Heights*, 429 U.S. at 266); *see also Bethel World Outreach Ministries*, 706 F.3d at 559 (citing *Arlington Heights* to support analysis of circumstantial evidence in weighing nondiscrimination claim).

The Chabad asserts that HDC enforced Connecticut General Statutes § 7-147d(a) *et seq.* against it in a discriminatory manner; yet, in weighing the Chabad's claim, the district court looked solely to whether the Chabad had identified comparator religious institutions that were "'identical in all relevant respects'" to the Chabad. *Chabad II*, 853 F. Supp. 2d at 231 (quoting *Racine Charter One, Inc. v. Racine Unified Sch. Dist.*, 424 F.3d 677, 680 (7th Cir. 2005)). This was in error. As in *Arlington Heights*, analysis of a claim brought under RLUIPA's nondiscrimination provision requires a "sensitive inquiry into such circumstantial and direct evidence of intent as may be available." *Arlington Heights*, 429 U.S. at 266. Accordingly, courts assessing discriminatory intent under RLUIPA's nondiscrimination provision have considered a multitude of factors, including the series of events leading up to a land use decision, the context in which the decision was made, whether the decision or decisionmaking process departed from established norms, statements made by the decisionmaking body and community members, reports issued by the decisionmaking body, whether a discriminatory impact was foreseeable, and whether less discriminatory avenues were available. *See Bethel World Outreach Ministries*, 706 F.3d at 559-60; *Church of Scientology of Ga., Inc.*, 843 F. Supp. 2d at 1370-76.

Here, the district court bypassed consideration of circumstantial evidence that might have supported the Chabad's claim and instead considered only the Chabad's cited comparators. While such evidence is certainly germane to a selective enforcement analysis, it is not necessary to establish a nondiscrimination claim. Contrary to the equal terms provision, which turns on "less than equal" treatment of religious as compared to nonreligious assemblies or institutions, the nondiscrimination provision bars discrimination "on the basis of religion or religious denomination," a fact that may be proven without reference to a religious analogue.[12] 42 U.S.C. § 2000cc(b)(1), (2). Moreover, while comparators must exhibit some similarity to permit meaningful analysis, a requirement that they be "identical" is unduly restrictive. *See Third Church of Christ, Scientist*, 626 F.3d at 670 (surveying various bases for comparison relied upon by circuits, none of which require comparators to be "identical"). Indeed, such a requirement would exempt many historic districts from RLUIPA's reach, given the likelihood that newer faiths

---

[12] While it is thus possible that a nondiscrimination plaintiff could establish a selective enforcement claim based on facially discriminatory conduct or arbitrary decisionmaking alone, it is difficult to imagine an equal terms plaintiff succeeding in an as-applied challenge without evidence of a secular comparator that was more favorably treated.

would be absent.[13]

Because the district court did not look beyond religious comparators in weighing the Chabad's nondiscrimination claim, we vacate the grant of summary judgment to the defendants on this claim and remand for consideration of whether the Chabad established a prima facie nondiscrimination claim, cognizant of the fact that such discrimination must be "on the basis of religion" and not other, legitimate factors. *See Bethel World Outreach Ministries*, 706 F.3d at 559-60 (affirming grant of summary judgment for defendants on a nondiscrimination claim where evidence showed that opposition to plaintiff's proposed land use was due to size of the proposed facility, and the plaintiff failed to present comparative evidence that could demonstrate the concern with size was pretextual).[14]

## B. The Chabad's Remaining Claims

We conclude that the Chabad has waived appeal of its remaining claims due

---

[13] We decline to address the exact parameters of the religious assemblies or institutions that may properly serve as comparators in this case, both because such delineation may prove unnecessary on remand if there are none, *see Chabad II*, 853 F. Supp. 2d at 231 ("[I]t does not appear that any of the houses of worship to which Chabad points have made any additions since the current HDC regime was implemented."), and because we leave the selective enforcement inquiry to the district court to conduct in the first instance.

[14] We decline to address the Chabad's "class-of-one" equal protection argument in support of its nondiscrimination claim, which it raises for the first time on appeal. *See O'Hara v. Weeks Marine, Inc.*, 294 F.3d 55, 67 n.5 (2d Cir. 2002).

to insufficient briefing.  *See Norton v. Sam's Club*, 145 F.3d 114, 117 (2d Cir. 1998) ("Issues not sufficiently argued in the briefs are considered waived and normally will not be addressed on appeal.").  The Chabad's brief devotes sections to each of its federal Constitutional claims, but these sections simply recite the district court's ruling and are thus insufficient to preserve the Chabad's appeal.  The brief fails even to mention the Chabad's conspiracy and state law claims.  Accordingly, we affirm the district court's grant of summary judgment to the defendants on these claims.

**C. Rabbi Eisenbach's Standing**

Rabbi Eisenbach appeals from the district court's dismissal of his claims for lack of standing under federal and state law.  The district court first determined that Rabbi Eisenbach did not have standing under RLUIPA because he did not assert a sufficient property interest in 85 West Street.  *Chabad I*, 796 F. Supp. 2d at 338 (citing 42 U.S.C. § 2000cc-5(5), which requires a claimant to have "an ownership, leasehold, easement, servitude, or other property interest in the regulated land or a contract or option to acquire such an interest").  The court held that Rabbi Eisenbach's use of the proposed facilities and his speculative "right to place a mortgage lien" on the property to recoup unpaid salary were not "property interest[s]" under RLUIPA.  *Id.* at 338.  We disagree at least insofar as the district court analyzed Rabbi

36

Eisenbach's property interest as a jurisdictional matter.

The Supreme Court has recently clarified the distinction between Article III standing – which is a prerequisite to the invocation of federal court jurisdiction – and what has been referred to as "statutory standing" – which has at times been held to be jurisdictional and at others nonjurisdictional. *See Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377, 1386-88 & n.4 (2014). Under Article III's "case" or "controversy" requirement, a party invoking federal court jurisdiction must demonstrate that he has "suffered or [is] imminently threatened with a concrete and particularized 'injury in fact' that is fairly traceable to the challenged action of the defendant and likely to be redressed by a favorable judicial decision." *Id.* at 1386 (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)). Where this "'irreducible constitutional minimum of standing'" is satisfied, *id.* (quoting *Lujan*, 504 U.S. at 560), "a federal court's obligation to hear and decide cases within its jurisdiction is virtually unflagging," *id.* (internal quotation marks omitted).

By contrast, determination whether a statute permits a plaintiff to pursue a claim "is an issue that requires [courts] to determine . . . whether a legislatively conferred cause of action encompasses a particular plaintiff's claim." *Id.* at 1387. As opposed to whether the plaintiff may invoke a court's jurisdiction, the question is

whether the plaintiff "has a cause of action under the statute." *Id.* The determination whether a statute grants a plaintiff a cause of action is "a straightforward question of statutory interpretation," operating under the presumptions that the plaintiff must allege interests that "fall within the zone of interests protected by the law invoked," *id.* at 1388 (internal quotation marks omitted), and injuries that were "proximately caused by [the alleged] violations of the statute," *id.* at 1390. As the Supreme Court has made clear, determination whether a claim satisfies these requirements goes not to the court's jurisdiction – that is, "*power*" – to adjudicate a case, but instead to whether the plaintiff has adequately pled a claim. *Id.* at 1387 n.4; *see id.* at 1389 n.5.

There can be little doubt that Rabbi Eisenbach has met the constitutional requirements of Article III standing to assert his RLUIPA claim. At a minimum, Rabbi Eisenbach alleged that he intended to live at the proposed facilities. The HDC's denial of the Chabad's application, and the conditions it imposed on any renewed application, thus deprived Rabbi Eisenbach of the ability to live in the facilities as proposed, an injury that may be redressed by relief from the district court.

Instead, the issue of Rabbi Eisenbach's standing to pursue his RLUIPA claims turns on whether his allegations place him in the class of plaintiffs that RLUIPA protects – that is, whether he has stated a claim upon which relief can be granted.[15] Accordingly, we vacate the district court's holding that Rabbi Eisenbach lacked standing under RLUIPA and remand for determination whether he has stated a claim. In so doing, we note that, while Rabbi Eisenbach's alleged "right" to impose a lien is seemingly distinct from the other property interests cited in RLUIPA, the allegation will nonetheless "warrant[] addressing" on remand. *See Chabad I*, 796 F. Supp. 2d at 339.

Finally, the district court dismissed Rabbi Eisenbach's federal and Connecticut constitutional claims, as well as his claim pursuant to the CFRA, on the ground that they were derivative of the Chabad's claims. In his brief, Rabbi Eisenbach merely asserts – conclusorily and without record citations – that he "has independent

---

[15] Prior to *Lexmark International*, at least two other circuit courts held that the existence of a property interest under RLUIPA goes to the plaintiff's standing. *See Covenant Christian Ministries, Inc. v. City of Marietta*, 654 F.3d 1231, 1239 (11th Cir. 2011) (holding that pastor's lack of a property interest denied him standing to pursue RLUIPA claim); *DiLaura v. Ann Arbor Charter Twp.*, 30 F. App'x 501, 507 (6th Cir. 2002) (finding that memorandum of understanding to transfer property to plaintiff was a sufficient property interest under RLUIPA to confer standing); *but cf. Taylor v. City of Gary*, 233 F. App'x 561, 562 (7th Cir. 2007) ("assum[ing]" that plaintiff who failed to plead a property interest had standing for RLUIPA, but dismissing the action for failure to state a claim). However, in light of *Lexmark International*, we cannot join these holdings.

constitutional claims" that are "clearly expressed in the [complaint]." Appellants' Br. at 61-62. The brief fails to cite a single Connecticut case to support his argument, nor does it cite pertinent cases regarding federal law under 42 U.S.C. §§ 1985 and 1986. As such, we deem his appeal of these claims to be waived and affirm their dismissal. S*ee Sam's Club*, 145 F.3d at 117.

## D.  The Individual Defendants' Immunity

Hillman and Crawford argue that they are entitled to absolute immunity because they acted in a quasi-judicial capacity as members of the HDC and, in the alternative, are entitled to qualified immunity, as the Chabad's right to a certificate of appropriateness was not clearly established at the time of the denial. We leave these issues to the district court to address in the first instance, in addition to consideration whether Crawford is properly subject to this suit in the absence of evidence that she voted on the application. *See Dardana Ltd.*, 317 F.3d at 208.

## CONCLUSION

For the foregoing reasons, we vacate the district court's order dismissing Rabbi Eisenbach's RLUIPA claims for lack of standing and remand for further proceedings as to these claims, but affirm the dismissal of the remainder of Rabbi Eisenbach's claims. We also vacate the district court's judgment as to the Chabad's

claims under RLUIPA's substantial burden and nondiscrimination provisions, and remand for further proceedings as to those claims, but affirm the dismissal of the Chabad's claim under RLUIPA's equal terms provision, as well as its claims under the federal and Connecticut constitutions and Connecticut state law. Thus, the June 20, 2011 order of the district court is VACATED IN PART AND AFFIRMED IN PART, the February 21, 2012 judgment of the district court is VACATED IN PART AND AFFIRMED IN PART, and the case is REMANDED for further proceedings.